UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENESIS OFFICE SYSTEMS, INC.

                              Plaintiff,

            - against -

GESTETNER/SAVIN CORPORATION, RICOH
CORPORATION AND ADVANCE BUSINESS
SYSTEMS

                              Defendants.

Index No. 07 CV 3682 (DC)

**AFFIDAVIT OF MARK L. WEYMAN
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

STATE OF NEW YORK  )
                   ) ss:
COUNTY OF NEW YORK )

        MARK L. WEYMAN, being duly sworn, deposes and says:

        1.    I am a member of the firm of Anderson Kill & Olick, P.C., counsel

for Defendants Gestetner/Savin Corporation ("Savin"), Ricoh Corporation ("Ricoh") and

Advance Business Systems ("Advance") (together, "Defendants") and am duly admitted

to practice before this Court.  I submit this affidavit in support of Defendants' motion to

dismiss this action in its entirety, pursuant to pursuant to Federal Rule of Civil

Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

        2.    Attached hereto as Exhibit "A" is a true and correct copy of the

Complaint filed in this action on May 9, 2007.

        3.    Attached hereto as Exhibit "B" is a true and correct copy of the

Dealer Sales Agreement between Plaintiff and Ricoh with an expiration date of March

31, 2004.

4.    Attached hereto as Exhibit "C" is a true and correct copy of the

Dealer Sales Agreement between Plaintiff and Savin with an expiration date of October

31, 2003.

5.    Attached hereto as Exhibit "D" is a true and correct copy of the

unreported decision of the Court of Special Appeals of Maryland, filed May 3, 2006.

6.    For the reasons set forth in the accompanying memorandum of law,

Defendants' motion to dismiss should be granted in all respects.

_____
Mark L. Weyman

Sworn to and subscribed before me
this 7th day of September, 2007.

_____
NOTARY PUBLIC

DONALD FLYNN
NOTARY PUBLIC, State of New York
No. 01FL5046358
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires July 10, 2011

# EXHIBIT A

JUDGE CHIN                    07 CV   3682

| | |
|---|---|
| GENESIS OFFICE SYSTEMS, INC.<br>3rd Floor — Suite 300<br>1701 Madison Avenue<br>Baltimore, Maryland 21217 | *  IN THE<br>*<br>*  UNITED STATES<br>* |
| Plaintiff, | *  DISTRICT COURT<br>* |
| vs. | *  FOR THE<br>* |
| GESTETNER/SAVIN CORPORATION<br>Southpointe Industrial Park<br>171 Hillpointe Drive<br>Canonsburg, Pennsylvania 15317 | *  SOUTHERN DISTRICT<br>*<br>*  OF NEW YORK<br>* |
| & | * |
| RICOH CORPORATION<br>Five Dedrick Place<br>West Caldwell, New Jersey 07006 | * |
| & | * |
| ADVANCE BUSINESS SYSTEMS<br>10755 York Road<br>Cockeysville, Maryland 21030 | * |
| Defendants. | *  _____ cv _____ (___) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT
### Breach of Contracts & Tort

TO THE HONORABLE, THE JUDGE OF SAID COURT:

GENESIS OFFICE SYSTEMS, INC. (hereinafter "Genesis"), Plaintiff, by Ms. Angelyn

D. Johnson and Rev. Rickey Nelson Jones, attorneys, respectfully represents unto Your Honor:

1. That Genesis is a Maryland Corporation dealing in the sales and service of copy

machines, duplicators (high volume copiers), fax machines, office equipment, etc.

2. That Defendants Gestetner/Savin Corporation (hereinafter "GS") and Ricoh

Corporation (hereinafter "Ricoh") are corporations supplying copy machines, duplicators, fax machines, office equipment, etc. to various dealers and sellers, including dealers in the state of Maryland.

3. That Defendant Advance Business Systems (hereinafter "Advance") is a Maryland Corporation dealing in the sales and service of copy machines, duplicators, office equipment, etc.

4. That after suing GS, Ricoh, and Advance in a Maryland Circuit Court, the case was dismissed without prejudice to be re-filed in New York pursuant to a Forum Selection Clause in the parties' agreement.

<u>Breach of Contract by GS</u>

5. Genesis was a stellar dealer for GS for over fifteen years, never being notified of any problems, complaints, or failures.

6. Following the merger of Gestetner Corporation into Savin Corporation, Genesis received a letter dated June 23, 1998 indicating it would no longer be supplied with Gestetner products, effectively breaching its contract and threatening Genesis as a corporation. <u>Exhibit</u> "A-1". The letter also indicated the termination would take effect in <u>three</u> days.

7. After writing Savin Corporation and outlining its existing contract with Gestetner, and how breaching such would tremendously jeopardize its numerous contracts with other companies it is obligated to provide products and services to (e.g., Baltimore Gas & Electric), GS decided to refrain from acting and meet with Genesis. <u>Exhibit</u> "A-2"

8. In 1999, GS met with Genesis to persuade it to abandon its Baltimore territory for sales and service, not honor their agreement.

9. GS offered other territories to Genesis and even offered Genesis $50,000.00 credit. GS sought to get Genesis to abandon its Baltimore territory, in writing, in order to give such territory

to another dealer, namely, Advance. Exhibit "B"

     10. Genesis declined GS's offer to abandon the Baltimore territory and refused to sign any documents purporting to indicate such. However, to keep harmony, Genesis did accept the additional territories offered and the $50,000.00 credit given for accepting them.

     11. In declining to abandon the Baltimore territory, Genesis made it clear to GS that it had many customers, contacts, and contracts in the Baltimore territory, established over the course of approximately two decades.

     12. Genesis' Dealer Agreement with GS (Exhibit "C") provided that GS could appoint other retailers in Genesis' territory but such would **"not operate as a termination or cancellation of this Agreement."** (Page 2, paragraph #2)

     13. According to the Dealer Agreement, it expired by its terms on October 31, 2003

        *"provided, however, that in the absence of a replacement agreement,*

        *Savin and Dealer may agree in writing to continue their relationship on*

        *a month-to-month basis pursuant to the terms and conditions of this*

        *Agreement as in effect on December 12, 2002, until the earlier to occur of:*

        *(i) Dealer's notification in writing of its intention to discontinue its relationship*

        *with Savin.*

        *(ii) the acceptance and subsequent execution by Savin and Dealer of a successor*

        *Dealer Agreement; or*

        *(iii) the provision, by Savin, of 30 days prior written notice that this Agreement*

        *(as extended) shall expire at the end of such 30-day period." (Paragraph 9[e] of*

        *Dealer Agreement)*

14. On October 31, 2003, Genesis and GS did not enter a written month-to-month agreement to continue their relationship pursuant to the terms of the Dealer Agreement.

15. However, Genesis and GS did agree to continue doing business (i.e., sales and service of GS products), establishing a new contract without limitation (with the old as only a guide).

16. Genesis continued to sale and service GS's products in its Baltimore territory, as well as the new territories given to the company by GS, for months. Genesis also leased a building in one of the new territories in order to sale GS's products, with GS's knowledge and approval.

17. By letter dated March 24, 2004, Genesis received notice from GS seeking to terminate their professional relationship after twenty years because of Genesis' refusal to abandon its Baltimore territory for the benefit of Advance. Exhibit "D"

18. Genesis' attorney wrote GS a letter explaining the inappropriateness of their attempt to terminate their twenty year professional relationship in order to give Advance Genesis' territory and business inconsistent with the very agreement they cite.

19. GS's attorneys responded to the letter by denying they are doing anything wrong and maintaining that the professional relationship is terminated, effective May 24, 2004.

## Breach of Contract by Ricoh

20. Plaintiff Genesis adopts by reference the allegations contained in paragraphs 1 through 19 of this Complaint with the same effect as if herein fully set forth.

21. Genesis had also been an authorized dealer with Ricoh Corporation for over a decade.

22. Key officials in GS occupy vital positions with Ricoh even though they are separate corporations.

23. Pursuant to the terms of the Dealer Agreement with Ricoh, it terminated by its terms on March 31, 2004. Exhibit "E"

24. Ricoh and Genesis continued the professional relationship in full.

25. For months, Genesis continued to sale and service Ricoh products in its territories.

26. Despite no contractual or dealership problems with Ricoh whatsoever, by letter dated April 30, 2004, Ricoh notified Genesis of its intention to terminate their professional relationship by June 30, 2004 (See. Exhibit "F").

27. Due to GS's decision to terminate Genesis' dealership for the benefit of Advance and the commonality of personnel in Ricoh and GS, the Dealer Agreement's prohibition on terminating such agreements when other companies are permitted to sell in territories previously allotted to another would be violated by Ricoh on June 30, 2004.

28. Ricoh's desire to make Advance the sole dealer in Baltimore and its desire to "hand over" all the business built up by Genesis over the course of two decades produced a breach of contract on June 30, 2004, under the guise of termination of the parties' automatic month-to-month agreement.

29. The unified effort of GS and Ricoh to "give" the Baltimore territory to Advance, along with the business established by Genesis, has effectively ignored the parties' contract and threatened Genesis as a company.

30. GS and Ricoh have also ignored the expenses and liability Genesis faces in the numerous contracts entered to [i] lease property and [ii] service their products.

31. The combined efforts of GS and Ricoh to "kill" Genesis as a company caused substantial losses.

**WHEREFORE**, Plaintiff Genesis demands judgment against Defendants GS and Ricoh as follows:

[A]    Defendant GS be enjoined from terminating its professional relationship with Genesis

(i.e., maintain Dealership Agreement with Genesis);

[B]    Defendant Ricoh be enjoined from terminating its professional relationship with Genesis (i.e., maintain Dealership Agreement with Genesis);

[C]    Defendants GS and Ricoh indemnify Genesis from all lawsuits, loses, costs, fines, judgments, etc. which arise due to the interference with Genesis' business, and

[D]    Defendants GS and Ricoh pay compensatory damages to Genesis of two hundred thousand dollars ($200,000.00), with interest and costs, for interfering with Genesis' business half way through its sales year and causing Genesis to lose guaranteed sales and business.

OR ALTERNATIVELY,

[I]    Defendant GS be found liable for compensatory damages of eight million three hundred forty five thousand seven hundred twenty dollars ($8,345,720), with interest and costs, representing the next twenty years[1] of business Genesis would generate based on its most recent sales figures with such products for 2001 and 2002;

[II]    Defendant Ricoh be found liable for compensatory damages of four million one hundred seventy two thousand eight hundred sixty dollars ($4,172,860), with interest and costs, representing the next ten years[2] of business Genesis would generate based on its most recent sales figures with such products for 2001 and 2002, and

[III]    Defendant GS and Ricoh indemnify Genesis from all lawsuits, costs, fines, judgments, etc. due to obligations undertaken by Genesis for the benefit of Defendants' products.

---

[1] Genesis has been a dealer with GS for twenty years.

[2] Genesis has been a dealer with Ricoh for ten years.

### Tortious Interference With Prospective Advantage

32. Plaintiff Genesis adopts by reference the allegations contained in paragraphs 1 through 31 of this Complaint with the same effect as if herein fully set forth.

33. During or around 1999, Advance sought to acquire the Baltimore territory from Genesis and entered agreement(s) with GS and/or Ricoh to that end.

34. In 1999, GS met with Genesis in order to effectuate its agreement(s) with Advance, seeking to get Genesis to abandon the Baltimore territory in total.   Exhibit "B"

35. Unsuccessful, GS threatened Genesis with termination of its dealership.

36. After Genesis' Baltimore customers continuously turned to the company for sales and service, Advance directed GS to exclude Genesis from the Baltimore territory.

37. In an effort to appease Advance, GS and Ricoh forwarded letters to Genesis indicating the termination of Genesis' dealerships with the companies.   Exhibits "D" & "F"

38. Advance intentionally and improperly sought to exclude Genesis from the Baltimore territory and Baltimore business Genesis had built up over two decades.

39. Advance made agreements with GS and/or Ricoh to further its goal of acquiring the Baltimore territory and Baltimore business, to the exclusion of Genesis.

40. Advance improperly interfered with Genesis' Dealership Agreements by causing GS and Ricoh to terminate Genesis' dealerships even though nothing occurred in the relationship in twenty years to warrant termination.

**WHEREFORE,** Plaintiff Genesis demands judgment against Advance in the amount of two hundred thousand dollars ($200,000.00) in compensatory damages and one million dollars ($1,000,000.00) in punitive damages, with interest and costs.

*I solemnly affirm, under the penalty of perjury and upon personal knowledge, that the contents of the foregoing paper are true.*

Ron Hawkins, CEO Genesis Office Systems, Inc.

Respectfully submitted,

Angelyn D. Johnson
Law Office of Angelyn D. Johnson, Esq.
26 Court Street, Suite 1812
Brooklyn, New York 11242
(718) 875-2145
*SDNY Bar#: 2151439*

Rev. Rickey Nelson Jones
Law Offices of Reverend Rickey Nelson Jones, Esq.
3rd Floor — Suite 5
1701 Madison Avenue
Baltimore, Maryland 21217
(410) 462-5800
*Pro Hac Vice Counsel*

**ATTORNEYS FOR PLAINTIFF**

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury.

Angelyn D. Johnson
Law Office of Angelyn D. Johnson, Esq.
26 Court Street, Suite 1812
Brooklyn, New York 11242
(718) 875-2145
*SDNY Bar#: 2151439*

Rev. Rickey Nelson Jones
Law Offices of Reverend Rickey Nelson Jones,
            Esq.
3rd  Floor — Suite 5
1701 Madison Avenue
Baltimore, Maryland 21217
(410) 462-5800
*Pro Hac Vice Counsel*


**ATTORNEYS FOR PLAINTIFF**



**savin.**  EXHIBIT **A-1**

Savin Corporation

30 West Gude Drive
Suite 350
Rockville, MD 20850
(301) 517-4200
SAVINFAX (301) 517-4217

June 23, 1998

Mr. Ronald Hawkins
Genesis Office Systems
Baltimore, Md. 21215

Re:   Gestetner Division

Dear Mr. Hawkins,

Please be advised that Gestetner Corporation merged into Savin Corporation as of
April 1, 1998 and that we have discontinued the sale of Gestetner branded
products through branch operations. In this connection, we are no longer operating
through the branch/dealer system.

Accordingly, we hereby give you notice that we will not accept orders for
Gestetner branded products after June 26, 1998.

We wish you success in your future endeavors.

Sincerely,

Ray Devlin
General Manager
Washington, DC Branch



**OFFICE SYSTEMS, INC.**

940 Madison Avenue • Suite No. 100 • Baltimore, MD 21201

Telephone: 410-225-0500 • FAX: 410-669-2290

July 24, 1998

EXHIBIT 

**VIA FACSIMILE AND OVERNIGHT MAIL**

Mr. Jim Ivy
Savin Corporation
333 Ludlow Street
P.O. Box 10270
Stamford, Ct. 06904-2270

Dear Mr. Ivy,

In the last two (2) months, I have been puzzled and very disturbed about the way Gestetner/Savin Corporation has handled this matter concerning my Branch/Dealership Agreement. Before I retain legal counsel, I want to try one last time to resolve this situation in a friendly fashion. But the time is very short, and I have tried without success thus far to achieve this.

Mr. Ivy, for eight years of my life I worked for Gestetner Corporation. I became a sales representative and became one of Gestetner's top sales representatives in the country, with national awards year after year. Thereafter, I was promoted to a sales manager in the Baltimore branch. I was later asked to become a branch manager in the New York area, but could not move my family to New York. I asked to become a dealer for Gestetner Products. Because of my relationship with Harold King, Gestetner's Baltimore Branch Manager, we decided the best approach was for me to form a Branch/Dealership. The Branch/Dealership papers for my company, Genesis Office Systems, Inc., were completed and for the last fifteen (15) years, I have been representing Gestetner products in the Baltimore area. I have built my sales and service to over $700,000 in 1997, much of which relates to my copier sales and service.

My company is a one hundred percent (100%) minority-owned, and operated office equipment business, certified by the city of Baltimore. Genesis has provided photo copiers, duplicators, computer systems, fax machines and other Gestetner products to a diversified customer base. Currently we serve over 600 accounts. The company's

APR 07 '19  01:33PM                                                                    P.3

Mr Jim Ivy
July 24, 1998
Page 2

customer base is broad and encompasses small-to-large businesses, a majority of which are minority operated.

I was shocked to receive a fax on June 23, 1998, advising me that because of the merging of Gestetner into Savin, Savin would not be selling Gestetner products to Genesis effective June 26, 1998. In essence I was given a three day notice. This occurred only a few weeks after you assured me that, notwithstanding the merger, Savin would work things out with me and would treat Genesis fairly. I have not been permitted to purchase equipment or accessories. Surely after marketing Gestetner products for so many years, I deserve better. More importantly, it is my understanding that even if my dealership could be terminated, at a minimum, Genesis would be due substantial reasonable notice, which after fifteen years, would be not less than six months.

The difference between three days notice and several months notice is enormous, as I am sure Savin knows. As Savin also knows, Genesis has a five year contract to supply Gestetner copiers, supplies and accessories to Baltimore Gas & Electric Company, which continues into 1999, with a renewal option. Genesis has a written commitment from Gestetner (now Savin) to provide copiers, accessories and parts to Genesis for this contract at specified prices. It is clear to me that not supplying Genesis, Savin now will be interfering with Genesis' obligation to live up to its contract with BG&E.

I also have large bids outstanding to the U.S. Navy and other national and local government bodies, which are being opened very soon.

I know that Advance Business Systems has received rights in the Baltimore market. I also know that a termination on three days notice is not only illegal, but must have resulted from pressure on Savin from Advance. Advance knows that, with Genesis eliminated, it can capitalize on all of Genesis' present business opportunities, which Genesis has developed. If that is not unfair competition, nothing is.

As you know, my career and that of Genesis have been a record of awards, high achievement and an outstanding payment record. We are a success story, in black, white or any color. Now Savin -and - Advance have acted in a manner which frankly, can only be called dishonorable, to the great prejudice on my business.

Genesis is threatened with destruction. I have been left with no choice but to take prompt, aggressive action, unless you communicate with me favorably by August 10. There is time to resolve this as friends, but little remains.

Sincerely,

Rob Hawkins, C.E.O.
Genesis Office Systems, Inc.

# EXHIBIT _B_



## RIDER TO DEALER AGREEMENT BETWEEN SAVIN CORPORATION AND GENESIS OFFICE SYSTEMS, INC.

This Rider among Savin Corporation ("Savin") and Genesis Office Systems, Inc. ("Dealer") and Ron Hawkins ("Hawkins") forms a part of the Dealer Agreement between Savin and Dealer dated the date hereof (the "Agreement"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Agreement.

WHEREAS, Savin, Dealer and Hawkins entered into a letter agreement dated January 26, 1999 ("Letter Agreement") which, among other things, terminated a certain Branch/Dealer Agreement between Dealer and Savin's predecessor, Gestetner Corporation;

WHEREAS, subsequent to the Letter Agreement disputes have arisen between Genesis and Hawkins on the one hand and Savin on the other hand; and

WHEREAS, the parties have agreed to resolve their disputes amicably by, among other things, entering into the Agreement and this Rider.

THEREFORE, IT IS AGREED AS FOLLOWS:

1. Without limiting Dealer's territorial restrictions otherwise contained in the Agreement, Dealer shall not sell new Gestetner brand Machines in the City of Baltimore, Maryland and the counties of Anne Arundel, Baltimore, Carroll, Harford, Howard and Queen Anne's, Maryland or upgrade Gestetner brand Machines for Dealer's existing customers in the City of Baltimore, Maryland and the counties of Arundel, Baltimore, Carroll, Harford, Howard and Queen Anne's, Maryland.

2. Hawkins acknowledges and agrees that his written guarantee dated February 23, 1999 and executed by Hawkins February 24, 1999 is valid and enforceable in accordance with its terms and that Hawkins has no defenses, counterclaims or rights of set-off which would affect

Savin's right and ability to enforce the Guarantee, and to the extent he has any defenses, counterclaims or rights of setoff, Hawkins waives such defenses, counterclaims or rights of setoff.

     3.  Without limiting the voluntary releases contained in the Letter Agreement, Genesis and Hawkins on the one hand and Savin on the other hand voluntarily release and forever discharge each other, their directors, officers, agents and employees from all actions and claims of any kind whatsoever arising out of or relating to Genesis' and Hawkins' relationship with Savin from January 26, 1999 to the date hereof except that Genesis is not released from its payment obligations upon any open account or indebtedness to Savin for Product.

Dated:  New York, New York
        November _____, 1999

SAVIN CORPORATION

By: _____

GENESIS OFFICE SYSTEMS, INC.

By: _____

RONALD HAWKINS, Individually

By: _____



**SAVIN CORPORATION**
**DEALER AGREEMENT**
**GESTETNER BRAND**

THIS AGREEMENT is made as of December 12, 2002, between Savin Corporation ("Savin") and *GENESIS OFFICE SYSTEMS INC* ("Dealer").

Dealer desires to market certain Gestetner brand products at retail prices to end-user customers within Dealer's Territory (defined below), and to provide service for such products in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the covenants in this Agreement, Savin and Dealer agree as follows:

1.    **Statement of Purpose.** The purpose of this Agreement is to promote and achieve in Dealer's assigned territory the effective retail sale, rental and lease ("sale") and servicing by Dealer of Gestetner brand (i) Copier, Copyprinter, Color, Fax and related accessories designated on Schedule A attached hereto and such additional products as Savin shall, in its sole discretion, designate by written notice to Dealer (collectively, the "Machines") and (ii) supplies and parts sold by Savin ("Supplies"). Machines and Supplies are collectively referred to in this Agreement as "Products."

2.    **Appointment.** Savin appoints Dealer as an authorized retail seller of the Products. Dealer's primary responsibility shall be to market the Products on a retail basis within the bounds of the territories designated on Schedule B attached hereto (collectively, the "Territory"). Such appointment is not exclusive, and Savin may in its sole discretion, at any time and without cause or notice, market its Products, or appoint other retailers whose primary responsibility may be to market and sell the Products in all or a portion of the Territory. Any such additional appointments shall not operate as a termination or cancellation of this Agreement.

(a)    Dealer shall not sell or otherwise market the Products at wholesale prices and specifically warrants and commits that all sales will be at retail prices.

(b)    Savin may discontinue the sale of or may change, modify or alter, any Products upon notice to Dealer.

3.    **Operating Standards.**

(a)    **Minimum Purchase and Sales.** Dealer will use its best efforts to develop diligently the retail sale of Products to their full potential within the Territory; will develop and maintain the potential for such sales; and will obtain a market share for Machines acceptable to Savin. Whether Dealer has satisfied this operating standard will be determined principally by reference to the Quota (defined below). Dealer agrees to purchase from Savin and sell, lease or rent to bona fide retail end users that are located in the Territory (each, a "Customer", and collectively, the "Customers") the quantities of Machines designated on Schedule C to this Agreement (the "Quota"). Dealer will engage in the sale, rental and service of Products only from its authorized sales and service location and only to Customers.

(b)    **Authorized Sales and Service Location.** In order to provide Product presentation commensurate with the goodwill attached to the name Savin and the Gestetner brand, and to provide prompt and effective service, Dealer will adequately equip, decorate and furnish its authorized sales and service location for the display, sale and service of Products, and maintain and staff that location with experienced, trained and competent personnel in all departments during normal business hours. The authorized sales and service location from which Dealer may sell and service Products under this Agreement is shown on Schedule D attached hereto.

2

EXHIBIT D

# Gestetner

**RICOH** Corporation

Southpointe Industrial Park
171 Hillpointe Drive
Canonsburg, PA 15317
Phone:  800-844-8961
Fax:     800-845-6016

March 24, 2004

**Certified Mail**
**Return Receipt Requested**

Mr. Ron Hawkins
Genesis Office Systems Inc.
940 Madison Avenue Suite 100
Baltimore, MD 21201

Dear Mr. Hawkins.

We write to provide you with notice that the Savin Corporation Dealer Agreement dated December 12, 2002 between Savin Corporation and Genesis Office Systems Inc. will expire (effective 60 days from this notification) by its own terms pursuant to Section 9(e) of the Dealer Agreement.

While the Dealer Agreement does not require that Savin provide notice of such expiration, this letter is provided to you as a courtesy.

As of the Expiration Date, you must comply with the terms and provisions of Section 10(a) including but not limited to, the following:

(i)     Dealer shall not engage in any activity which might imply or represent that it is an authorized Savin dealer, and shall, at its sole expense, take all steps necessary to remove any listing in any telephone directory or other publication that it is an authorized Savin dealer;

(ii)    Dealer shall, at its sole expense, discontinue the use of Savin or Gestetner brand trademarks, trade names, labels and copyrights and materials and signs bearing the name Savin or Gestetner or any other trademark or trade name of Savin, and will remove such names and trademarks from letterheads, stationary and other forms used by Dealer; and

(iii)   The acceptance of any order from Dealer or the sale of any product to Dealer after termination shall not be construed as a renewal or extension, nor as a waiver of termination.

Please communicate immediately with your Dealer Sales Manager to turn over any Savin Corporation materials of any kind.

( - continued - )

Please note, how                                                    Agreement, that.

Savin will sell to Dealer, on a cash in advance basis, for a period of three (3) years after notice of termination, at the highest dealer price in effect at the time of such sales, Supplies (as defined in the Dealer Agreement) of the type sold to Dealer during the term of the Agreement, in quantities determined solely by Savin in the exercise of its business judgment, Savin will take into consideration, in the exercise of its judgment, the volume of Supplies sold by Savin to Dealer for Dealer's customers in the Territory during the one (1) year period immediately prior to the termination or expiration. The sale of any parts and supplies under this subparagraph (iii) will not constitute, in whole or in part, a dealer relationship between Savin and Dealer, or the reaffirmation or extension of Agreement; provided, however, that the terms and conditions of Paragraphs 3(f), 4, 5, and 6 of the Agreement shall apply to the purchase and sale of such Supplies.

While Savin will continue to provide service parts so that you may support your equipment base, we will terminate your SavinNet Service Agreement and remove your access to the SavinNet system.

Although Savin has elected not to renew the Dealer Agreement, we nonetheless wish you success in your future endeavors. Please do not hesitate to contact us if we may be of service to you in the future.

Savin reserves all of its right under the Dealer Agreement and nothing contained herein shall be deemed to constitute a waiver by Savin of any of its rights or remedies under the Dealer Agreement.

Sincerely,

Donald W. Michelucci
Director, Dealer Operations

DWM:lnr

cc:    Lori Bonaparte
       Wayne Hanselman
       Alan Nielsen
       Al Baldi
       Jan Saperstein
       Bob Tomsic
       Bob Brown

EXHIBIT __E__



# OFFICE PRODUCTS

# RETAIL DEALER SALES

# AGREEMENT

## GENESIS OFFICE SYSTEMS, INC.
### ACCOUNT #: 05155061

## EXPIRATION DATE:

# MARCH 31, 2004

**RICOH CORPORATION**

**5 Dedrick Place**

**West Caldwell, New Jersey**

**07006**

1



RICOH CORPORATION
Five Dedrick Place
West Caldwell, NJ 07006
Phone: 973-882-2000
Fax: 973-882-5840



April 30, 2004

**VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Ron Hawkins
GENESIS OFFICE SYSTEMS, INC.
940 Madison Avenue, Ste. 100
Baltimore, MD 21201

Dear Mr. Hawkins:

As you are aware, the Office Products Retail Dealer Sales Agreement (the "Agreement") by and between Ricoh Corporation ("Ricoh") and your dealership expired by its terms on 31 MAR 2004 and was extended on a month-to-month basis.

Ricoh has determined that it will not offer your dealership a renewal contract and, effective 30 JUN 2004, will allow the Agreement to expire. After that date, your dealership will no longer be authorized to sell Ricoh office products.

Ricoh will, subsequent to the expiration date of the Agreement, sell reasonable quantities of Consumable Supplies and Replacement Parts for such quantities of the Authorized Products that the records of Ricoh indicate have been installed, by your dealership, within the Territory assigned to your dealership prior to 30 JUN 2004. Such sales will be on a cash basis only and all orders are subject to reasonable availability.

Ricoh wishes to thank you for your efforts on our behalf in the past and wishes you good fortune in any future endeavors.

If there are any questions or comments regarding this action, please direct them to your Region Director.

Very truly yours,



Alan R. Nielsen
Vice President, Indirect Division

I.c.:     Region Director
          Region Service Manager
          G. Carbonello, Esq.



# EXHIBIT B



# OFFICE PRODUCTS

# RETAIL DEALER SALES

# AGREEMENT

## *GENESIS OFFICE SYSTEMS, INC.*
### ACCOUNT #: 05155061

## EXPIRATION DATE:

# MARCH 31, 2004

**RICOH CORPORATION**

**5 Dedrick Place**

**West Caldwell, New Jersey**

**07006**

1

# OFFICE PRODUCTS RETAIL
# DEALER SALES AGREEMENT

**THIS AGREEMENT**, which is made and entered into as of the effective date shown below, by and between RICOH CORPORATION ("Ricoh"), a Delaware corporation and _____GENESIS OFFICE SYSTEMS, INC._____, a _____MARYLAND_____ corporation, shall expire by its terms on March 31, 2004 unless sooner terminated pursuant to Section 15 below or unless extended by RICOH.

## STATEMENT OF UNDERSTANDING

Ricoh is in the business, among other things, of selling various office equipment products in the United States and desires to market certain of these office equipment products under the RICOH or *Aficio*™ brand name to end-users within the United States through a network of retailers.

Dealer wishes to become an authorized retailer for certain RICOH or *Aficio*™ brand office equipment products, sold by RICOH, and to sell, install and maintain such products to the satisfaction of the end-user.

During the term of this Agreement and in accordance with the terms and conditions set forth in the Agreement, RICOH and Dealer will act in a fair, equitable and ethical manner towards each other as well as to the end-user.

Definitions of certain terms used herein are set forth on Exhibit A.

**ACCORDINGLY**, RICOH and Dealer, in consideration of their mutual undertakings in this Agreement, agree as follows:

## SECTION 1.    DEALER'S NON-EXCLUSIVE APPOINTMENT

1.1 RICOH appoints Dealer as an authorized Retailer for only those RICOH or *Aficio*™ brand office equipment products ( the "Authorized Products) which are shown on Schedule B (which is affixed hereto and made a part hereof). Dealer's primary responsibility shall be to market the Authorized Products, on a retail basis only, within the bounds of the mutually agreed marketing Territory and only through Dealer's sales and service location(s) which are shown on Schedule A (which is affixed hereto and made a part hereof). **SUCH APPOINTMENT IS NOT EXCLUSIVE, AND RICOH MAY, IN ITS SOLE DISCRETION, AT ANY TIME AND WITHOUT CAUSE OR NOTICE, APPOINT OTHER RETAILERS** (which may or may not be owned by or under common control with RICOH) **WHOSE PRIMARY RESPONSIBILITY MAY BE TO MARKET RICOH AND/OR** *Aficio*™ **BRAND OFFICE EQUIPMENT PRODUCTS (WHICH MAY INCLUDE THE AUTHORIZED PRODUCTS) IN ALL OR A PORTION OF DEALER'S TERRITORY.** Any such additional appointments shall not operate as a diminution, termination or cancellation of this Agreement.

   (a) Dealer shall not sell or otherwise market the Authorized Products, or any Accessories, Replacement Parts and/or Consumable Supplies for the Authorized Products, at wholesale prices.
   (b) Dealer specifically warrants and commits that all of Dealer's sales of the Authorized Products, or any Accessories, Replacement Parts and/or Consumable Supplies for the Authorized Products, will be at retail prices and that all of Dealer's sales of the Authorized Products, or any Accessories, Replacement Parts and/or Consumable Supplies for the Authorized Products, will be for delivery to end-users within the Dealer's Territory within the United States for the end-user's own use and not for resale.

1.2 Dealer shall offer installation and Warranty Service for all Authorized Products (whether or not sold by Dealer) installed in Dealer's Territory, except that Dealer shall not be required to offer installation or Warranty Service for any Authorized Product sold by another Retailer for installation in the area assigned to such other Retailer where such Retailer is capable of rendering such installation and Warranty Service.

1.3 Dealer shall offer Warranty Service for all Authorized Products which are defined as portable or carry-in products, whether or not sold by Dealer, which an end-user may physically deliver to Dealer's Service Location.

## SECTION 2.    PASS-THROUGH PROGRAM

2.1 In the event that Dealer sells any Authorized Product for use outside of the authorized Territory and where Dealer fails, refuses or is unable to provide Installation and Warranty Service to the end-user, Dealer shall immediately make all necessary and appropriate arrangements to have such installation and Warranty Service provided by another authorized RICOH dealer or other retailer (which may be RICOH) in the area. Dealer shall immediately pay to such other authorized dealer or other retailer, within that area, an allowance for installation and Warranty Service plus such other dealer's or other retailer's advertising, promotion and sales expenses. The total allowance immediately due and payable to the authorized dealer or other retailer (including RICOH) in the area who provides such installation and Warranty Service shall equal Fifty Percent (50%) of the difference between the current manufacturer's suggested retail price and the then current single unit dealer price of the Authorized Product sold.

    (a) This allowance is designed to give the recipient dealer or retailer reasonable compensation for installation and Warranty Service to be performed and for the local advertising, promotion and sales expenses of such dealer or retailer.

2.2 In the event that Dealer sells any Authorized Product for use outside of the authorized Territory and where Dealer can and will provide adequate installation and Warranty Service to the end-user, Dealer shall immediately pay to any other authorized RICOH dealer, or other retailer, within that area, an allowance of twenty percent (20%) of the difference between the current manufacturer's suggested retail price and the then current single unit dealer price of the Authorized Product sold as reasonable compensation for such other dealer's, or other retailer's local advertising, promotion and sales expenses.

## SECTION 3.    RICOH MAJOR ACCOUNT PROGRAM

3.1 RICOH and Dealer agree to comply with the terms and conditions of the Ricoh Major Account Program ("RMAP"), as may be amended from time to time at Ricoh's option, and which terms and conditions are incorporated in this Agreement by reference.

3.2 Under RMAP:

    (a) RICOH, or its agent, reserves the right to solicit orders for the Authorized Products from all end-users that RICOH determines might be Major Accounts.

    (b) Dealer, when it determines that an end-user might be a Major Account, may continue to pursue a sale with such Major Account or may refer the sale to RICOH, all as provided in the terms and conditions of RMAP.

    (c) If RICOH negotiates or concludes a sale to, or a contract with, a Major Account, Dealer may participate in such sale or contract, as described in and in compliance with the RMAP, and in accordance with the terms, provisions and conditions of such sale or contract.

    (d) RICOH may direct Dealer to, and Dealer shall, install and service the Authorized Products at the locations of such Major Accounts if such Installation or service is to be performed:
        (1) within the bounds of Dealer's Territory; or
        (2) within a sixty (60) mile radius of a service location of Dealer; or
        (3) in an area not located in the Territory assigned to Dealer or any other Retailer of the Authorized Products and which is closer to an office location of Dealer than to an office location of any other Retailer of the Products}, in each such case RICOH shall pay to Dealer such installation and service fees as RICOH shall from time to time establish in writing, and which fees shall, at a minimum and in RICOH's good faith judgment, cover Dealer's anticipated installation and servicing costs.

    (e) Subject to the terms of the terms and conditions of RMAP, if RICOH concludes a sale to a Major Account and if Dealer was, in RICOH's sole judgment, instrumental to RICOH's conclusion of such sale, RICOH shall award the Dealer sales commissions in such amounts as RICOH may, from time to time, establish in writing.

(f) Dealer understands and agrees that it is without authority to, and shall not, modify or change any term or condition of any sale or contract described in Section 3.2 (c).

(g) Dealer shall indemnify and hold RICOH harmless from and against any and all lost profits, costs, expenses, liabilities or damages (including reasonable attorney's fees) incurred or paid by RICOH arising from Dealer's non-compliance with either this Section 3 or any provision of the terms and conditions of RMAP (including, without limitation, lost profits, costs, expenses, liabilities or damages arising from price reductions and price rebates which RICOH is required to grant due to Dealer's non-compliance with such Sections or arising from personal injuries and property damage due to Dealer's improper installation or servicing of Products).

(h) Changes in the fees and commission(s) established in the RMAP or as described in Sections 3.2 (d) (3) and (e) shall be effective thirty (30) days after the date of RICOH's notice of such changes.

(i) RICOH may refer to Dealer, or to any other Retailer (which may be RICOH) whose primary responsibility is the marketing of Authorized Products in all or a part of Dealer's Territory, such end-users which RICOH solicits, or which solicit RICOH, and which RICOH determines are not Major Accounts, but which express an interest in purchasing Authorized Products for installation in Dealer's Territory.

## SECTION 4.    PROMOTION AND MARKETING

4.1 Dealer shall, at all times during the Term of this Agreement:

(a) devote its best efforts to market the Authorized Products, on a retail basis only, to end-users within the Territory;

(b) display the Authorized Products only at those business locations shown on Schedule A. All such Authorized Products displayed as contemplated herein shall at all times be in good working order;

(c) use RICOH advertising and promotional materials which may be made available by RICOH to Dealer from time to time; and

(d) maintain commercial telephone listings (IN DEALER'S NAME ONLY) indicating that it is an authorized dealer for certain RICOH and/or Aficio™ brand office equipment products.

4.2 RICOH may contribute to Dealer advertising, in an amount to be determined by RICOH. For Dealer to qualify for this contribution, the format of the advertisement must be as provided in, and in compliance with, RICOH standards, as issued from time to time, and be approved by RICOH in advance.

## 4.3 DEALER SHALL NOT ADVERTISE ANY RICOH OR Aficio™ BRAND OFFICE EQUIPMENT PRODUCT OTHER THAN THOSE RICOH OR Aficio™ BRAND OFFICE EQUIPMENT PRODUCTS WHICH DEALER IS SPECIFICALLY AUTHORIZED TO SELL.

4.4 RICOH may require the participation of sales employees of Dealer in a RICOH sales training program at such times and in such locations as RICOH may, at its discretion, decide. Dealer agrees that it shall be responsible for and shall pay all of its sales employees expenses, including but not limited to, travel, lodging, meals and salary, while Dealer's sales employees attend such RICOH sales training program.

## SECTION 5.    MINIMUM PURCHASE COMMITMENTS AND REBATE

5.1 During each of the periods indicated on Schedule C, Dealer agrees that it shall purchase from RICOH, for sale and installation at locations of end-users in Dealer's Territory, sufficient quantities of the Authorized Products so as to meet the mutually agreed minimum purchase commitments set forth in Schedule C, or any amendments thereto. Minimum purchase commitments for each six (6) month period shall be determined, between Ricoh and Dealer, and set at the beginning of each six (6) month period for such six (6) month period.

5.2 Ricoh will use reasonable commercial efforts, but shall have no obligation to, provide rebate or incentive programs, in which each authorized Ricoh dealer may participate, pursuant to which those dealers who over-achieve their mutually agreed minimum purchase commitment during the previous six (6) month period may earn a revenue rebate, or other incentive reward, in accordance with the rebate/incentive program offered by Ricoh for such time-frame. Only dealers who have reached mutual agreement with Ricoh, in accordance with Section

4

5.1, regarding the minimum purchase commitments for the following six (6) month period , as evidenced by a written acceptance from the dealer, shall be entitled to participate in such rebate/incentive program(s).

5.3 Sales of any kind to end-users outside of Dealer's Territory or non-retail sales (which are specifically prohibited hereunder) shall not be counted towards the minimum revenue targets set forth in Schedule C, or any amendments thereto.

5.4 Dealer shall submit installation reports (the form of which is attached hereto as Exhibit B) to RICOH. Such reports shall be submitted monthly and be received by RICOH no later than the fifteenth (15th) day of the month following the month in which such installations are made.

5.5 The failure, refusal or inability (unless otherwise excused) of Dealer to comply with Section 5.1; the filing by Dealer of untimely or false reports under Section 5.4 (or the failure to file any such report); or any non-retail sales, by Dealer, shall be considered material breaches of this Agreement and shall constitute good and just cause for the termination, by RICOH, of this Agreement.

## SECTION 6.   TERMS OF SALE

6.1 RICOH shall sell and Dealer shall buy the Authorized Products at RICOH's prices in effect on the date of shipment. Each sale by RICOH and purchase by Dealer shall be governed by RICOH's terms and conditions of sale in effect at the time of shipment. RICOH shall not, in any event, be bound by any conflicting or additional terms and conditions of Dealer's Purchase Order, any other order form or any other documents issued by Dealer.

6.2 RICOH may alter its prices or its terms and conditions of sale at any time without prior notice, but shall endeavor to give Dealer thirty (30) days notice prior to any such change becoming effective. Dealer shall be responsible for and shall pay any present or future sales, use, excise, property or other similar tax applicable to the Authorized Products or to the sale, use, transportation or addition to the value of the Authorized Products.

6.3 Unless otherwise agreed in writing by RICOH and expressly set forth in writing on any invoice or shipping document, all prices are F.O.B. RICOH's distribution facility. Title to and all risk of loss or damage to the Authorized Products shall pass from RICOH to Dealer and Dealer shall bear all costs, insurance premiums, freight and all other charges and expenses incurred after RICOH places the Authorized Products in the custody of a carrier at such RICOH distribution facility for delivery to the Dealer.

6.4 Dealer has the option of:

  (a) payment by check, at the time an order for the Authorized Products is accepted by RICOH, in the full amount of the order less a cash discount in such amount as may be specified in writing from time to time by RICOH; or
  (b) purchasing the Authorized Products on credit, to the extent of Dealer's credit line (including all RICOH terms and conditions applicable to such credit line) as are established in writing, and which may be changed from time to time, by RICOH.

6.5 If Dealer does not pay to RICOH any amounts owing to RICOH pursuant to this Agreement, within the time specified by RICOH, Dealer agrees to pay a late payment charge on such overdue amount from the due date thereof until the amount due to RICOH (including any interest charges) is paid in full at the interest rate as RICOH may, from time to time, establish in writing; provided, however, that in no event shall such rate exceed the maximum allowable rate of interest permitted by law.

  (a) As of the date of this Agreement and until written notice is provided to Dealer by RICOH modifying such interest rate, the interest rate charged by RICOH on any overdue accounts equals one percent (1%) per month or twelve percent (12%) per annum.

6.6 In addition, if Dealer fails to make such payment when due, or if RICOH has good cause to believe Dealer's creditworthiness is diminished, or if RICOH deems itself insecure:

5

(a) RICOH may reduce, modify or eliminate Dealer's credit line with RICOH; or

(b) RICOH may decline to accept further orders from Dealer or to make further deliveries to Dealer until such deficiency is cured ;or

(c) RICOH may elect to make further deliveries only on a cash basis; or

(d) RICOH may require Dealer to provide adequate written assurance of Dealer's continued performance prior to making any further deliveries to or for the account of Dealer.

6.7 Subsequent to the exercise of any of the remedies listed in Section 6.6 above, RICOH will sell to Dealer, at Dealer's written request, on a cash basis and subject to reasonable availability, reasonable quantities of Consumable Supplies and Replacement Parts for such quantities of the Authorized Products which RICOH's records indicate have been installed within Dealer's Territory, by Dealer, prior to the effective date of the exercise of RICOH's remedies.

## SECTION 7.    LIMITED WARRANTY

7.1 RICOH and Dealer agree that they shall comply with the terms and conditions of RICOH's Limited Warranty, which terms and conditions are more fully set forth in the RICOH Dealer Service Policy Manual, as may be amended by RICOH from time to time, and which is incorporated by reference.

7.2 If the Authorized Products, or any components or parts thereof, require repair or replacement during the Warranty period specified in the RICOH Service Policy Manual, Dealer is required to provide such Warranty repair or replacement services.

7.3 In no event shall RICOH be responsible for any labor costs incurred by Dealer (including those incurred in the connection with the provision of Warranty Service) except as RICOH may otherwise specifically agree in writing.

7.4 RICOH shall have no responsibility for any damage caused to the Authorized Products during shipment to Dealer. It shall be the sole responsibility of Dealer to file appropriate claims for reimbursement with the carrier.

7.5 THE LIMITED WARRANTIES SET FORTH IN THE RICOH DEALER SERVICE POLICY MANUAL ARE EXCLUSIVE AND IN LIEU OF, AND RICOH EXPRESSLY DISCLAIMS, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE ARISING OUT OF CUSTOM OR USAGE WITH RESPECT TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION, QUALITY OR OTHERWISE.   RICOH SHALL NOT, IN ANY EVENT, HAVE ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SALE, USE OR PERFORMANCE OF THE PRODUCTS EVEN IF RICOH HAS BEEN NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

## SECTION 8.    FORCE MAJEURE

8.1 RICOH shall use its best efforts to make prompt and timely shipments of orders submitted by Dealer, but shall not be liable for the failure to provide Authorized Products or for the delay in shipment of the Authorized Products where such failure or delay is the result of strikes, lockouts, accidents, fire, delays in manufacture, transportation or delivery of materials, acts of God, embargoes, governmental or judicial actions or any other causes beyond RICOH's reasonable control.

8.2 Dealer shall have a reasonable time to cure any default caused solely by RICOH's inability to provide Authorized Products actually ordered by the Dealer.

**SECTION 9.    SERVICE REPRESENTATIVES**

9.1 To promote prompt and efficient service of the Authorized Products and end-user satisfaction, Dealer shall employ:

   (a) Within ninety (90) days of the acceptance of this Agreement by RICOH, at least two (2) Service Representatives, for each location designated in Schedule A, who have been trained to service each model of the Authorized Products purchased by Dealer;

   (b) At all times after the ninetieth (90th) day following the date of the acceptance of this Agreement by RICOH, the number required by Section 9.1(a), plus a number of Service Representatives such that the ratio of:

      (1) the number of any particular model of the Authorized Products purchased by Dealer to;

      (2) the number of Service Representatives trained to service that model is not less than the ratio which RICOH shall establish in writing from time to time with respect to such model,

   (c) Within ninety (90) days of the acceptance of this Agreement by RICOH, at least two (2) Service Representatives, for each location designated in Schedule A, where end-users may physically deliver portable or carry-in products, who have been trained to service each model of the portable or carry-in products (whether or not sold by Dealer).

9.2 RICOH may agree to offer Dealer's service employees a RICOH Authorized Technical Classroom Training Program at such times and in such locations as RICOH may, at its discretion, decide. Dealer agrees that it shall be responsible for and shall pay all of its service employees' expenses including but not limited to travel, lodging, meals, and salary, while Dealer's service employees attend such Program.

   (a) RICOH does not offer a RICOH Authorized Technical Classroom Training Program for those products that are defined as portable or carry-in products.

   (b) In order that Dealer may comply with Section 9.1 (c) above, Dealer agrees that it shall purchase at least one (1) RICOH Self-Pace Training Package (including one (1) unit of each portable or carry-in product for training purposes) for each model of the portable or carry-in products currently offered for sale by RICOH whether or not Dealer purchases such products for sale to end-users in Dealer's Territory and shall have its Service Representatives complete each Self-Pace Training Package prior to attempting to service such products.

9.3 Dealer agrees that, as a pre-condition of admission to a RICOH Authorized Technical Classroom Training Program:

   (a) Dealer must certify, on a form provided by RICOH, that the individual who will attend the Technical Training is a Dealer employee; and

   (b) the individual must successfully pass an entrance examination given by RICOH.

9.4 Dealer agrees that, when it repairs, installs or otherwise services the Authorized Products at end-user's locations, or at Dealer's facilities, it shall permit only Service Representatives trained to service such Authorized Products to provide such services.

9.5 Dealer shall indemnify and hold RICOH harmless from and against any and all lost profits, costs, expenses, liabilities or damages (including reasonable attorney's fees) incurred or paid by RICOH arising from Dealer's non-compliance with this Section 9 (including, without limitation, lost profits, costs, expenses, liabilities or damages arising from price reductions and price rebates which RICOH is required to grant due to Dealer's non-compliance with such Section or arising from personal injuries and property damage due to Dealer's improper Installation or servicing of Products).

9.6 RICOH may, at its discretion, refuse to deliver Authorized Products to any location of Dealer until there is at least one (1) employee of Dealer in such location who is a Service Representative trained to service such Product.

**SECTION 10.    REPLACEMENT PART REQUIREMENTS AND RECOMMENDATIONS**

10.1 In order that Dealer shall have sufficient parts to service the Authorized Products effectively, RICOH may require the Dealer, before the Dealer commences the sales of the authorized Products, to purchase a Basic Stock kit for such Authorized Products consisting of such items, and in such quantities, as are specified in writing by RICOH.

10.2 It is also recommended that Dealer, at all times after commencing sales of the Authorized Products, have in its inventory sufficient quantities of additional replacement parts, meeting the specifications and in the quantities listed in writing by RICOH, to adequately provide service for such Authorized Products sold to end-users located within Dealer's Territory.

10.3 When repairing, installing or otherwise servicing the Authorized Products, Dealer shall use only replacement parts meeting the specifications listed from time to time in writing by RICOH.

**SECTION 11.    RECORDS AND REPORTS**

11.1 In order for RICOH to determine Dealer's creditworthiness for the purposes of Section 6, it is necessary for Dealer to submit timely and accurate reports to RICOH.  Therefore, Dealer agrees to furnish, from time to time, such financial information (audited, if available) as RICOH may reasonably request, including without limitation, Dealer's then current balance sheet, income statement and sales figures.

    (a) The failure or refusal to supply such financial information as RICOH may reasonably request may cause RICOH to believe that Dealer's creditworthiness is diminished or RICOH may deem itself insecure.  In such event RICOH may elect any or all of the remedies set forth in Section 6.6 above.

11.2 RICOH shall treat such reports as confidential, and shall endeavor to prevent anyone other than RICOH corporate officers and employees from obtaining such reports from RICOH.

**SECTION 12.    TRADEMARKS**

12.1 Dealer shall not alter, obliterate, deface or remove any trade name, brand, trademark, service mark or serial number carried on any Authorized Product or on the packaging in which such Authorized Product is enclosed or add any name, brand, trademark or service mark.

12.2 If Dealer chooses to acquire and sell consumable supplies (including, but not limited to, toner cartridges or developers), for use in RICOH office equipment products, that:

    (a) are manufactured or otherwise obtained by Dealer from an independent supplier for sale, by Dealer, under Dealer's  trade name or label or for sale, by Dealer, under such independent supplier's trade name or private label;
    (b) are not clearly identified that the manufacturing source of the empty containers or consumable supplies therein is NOT RICOH; or
    (c) are genuine RICOH consumable supply cartridges or containers which are "USED" and which have been refilled, by or for Dealer, with non-RICOH manufactured consumable supplies;

**THEN, IN SUCH EVENT**, such items (cartons and cartridges) must bear an prominent disclaimer stating:

### THIS CONSUMABLE SUPPLY, WHICH IS FOR USE IN A
### RICOH PRODUCT, IS NOT MANUFACTURED, SPONSORED
### OR APPROVED BY RICOH CORPORATION.

12.3 Dealer shall not use any part of any RICOH or RICOH affiliate name, trade name, brand, trademark, trade dress  or service mark in connection with its own name or trade name, trademarks, service marks or otherwise in identifying its business.

8

12.4 Dealer shall not acquire, and specifically disclaims, any right or license in the names: "RICOH"; "RICOH Corporation"; "RICOH of America"; "*Aficio™*"; "Rapicom"; the name of any RICOH affiliate; or any names or numbers relating to the Authorized Products or other RICOH or RICOH affiliate products; or any other RICOH or RICOH affiliate trade names, brands, trademarks, trade dress or service marks, ALL OF WHICH ARE AND SHALL REMAIN THE SOLE AND EXCLUSIVE PROPERTY OF RICOH or its affiliates.

12.5 **DEALER IS PERMITTED SOLELY TO STATE, ORALLY OR IN WRITING, THAT IT IS AN AUTHORIZED DEALER FOR CERTAIN RICOH AND/OR *Aficio* BRAND OFFICE MACHINE PRODUCTS, BUT NO SUCH STATEMENT MAY INCLUDE OR REFER TO ANY RICOH, OR RICOH AFFILIATE, TRADE NAME, LOGO OR TRADEMARK..**

### SECTION 13.   CONFIDENTIALITY

13.1 Dealer shall not at any time hereafter, without the prior written consent of RICOH in each particular case, disclose to, or use or furnish for the benefit of any other person or entity (other than Ricoh) any proprietary information, trade secret, confidential data or know-how of RICOH relating to the Authorized Products which is made or becomes accessible to Dealer, unless such information shall have become public or general industry knowledge. Dealer shall take all reasonable measures necessary and appropriate to ensure the secrecy of any such information, including, without limitation, obtaining from its employees confidentiality agreements containing terms similar to those set forth in this Section 13.1. To the extent practicable, Dealer shall return any such information to RICOH immediately upon RICOH's request.

13.2 It is specifically agreed that, in the event of a breach or a threatened breach by Dealer (or its employees or former employees) of the terms of Section 13.1, RICOH shall be entitled to an injunction restraining Dealer or such other person from committing or continuing to commit any such breach, without showing or proving actual damage to RICOH.

### SECTION 14.   MODIFICATION OF PRODUCTS

14.1 RICOH may discontinue the sale of, or may change, modify or alter, any Authorized Product at any time without notice to Dealer.

14.2 Dealer shall notify RICOH, in writing, in advance of changing, modifying or altering any Authorized Product, and if in RICOH's sole judgment such proposed change, modification or alteration will impair the quality or end-user desirability of such Authorized Product, RICOH may prohibit such change, modification or alteration.

14.3 In the event Dealer changes, modifies or alters any Authorized Product without RICOH's written approval or after RICOH has prohibited same, Dealer agrees to indemnify and hold RICOH harmless from and against any and all damage, cost and expense, including reasonable attorney's fees, related to such unauthorized or prohibited change, modification or alteration.

### SECTION 15.   DURATION AND TERMINATION.

15.1 Dealer may at any time terminate this Agreement, with or without cause, upon not less than thirty-(30) day's prior written notice to RICOH.

15.2 RICOH may terminate this Agreement, prior to its expiration date of March 31, 2004, by written notice to the Dealer, sent by certified mail, return receipt requested, effective sixty (60) days from the date of notice, if Dealer fails to substantially comply with any material obligation of this Agreement and fails to cure such deficiency within sixty (60) days from the date of such RICOH notice.

15.3 Section 15.2 notwithstanding, RICOH may terminate this Agreement, prior to its expiration date of March 31, 2004, by written notice to the Dealer, sent by certified mail, return receipt requested, effective ten (10) days from the date of the notice if the Dealer becomes delinquent in payment of any account owed to RICOH and fails to cure such delinquency within ten (10) days from the date of such RICOH notice or if Dealer becomes insolvent, makes an assignment for the benefit of creditors, or files or has filed against it a petition in bankruptcy.

9

15.4 In the event this Agreement shall have expired by its terms on March 31, 2004 but neither RICOH nor Dealer shall have notified the other in writing of their intention to discontinue the relationship, then, in such event, this Agreement shall automatically continue in full force and effect on a month-to-month basis and on the same terms and conditions in effect on March 31, 2004 until the earlier of:

    (a) Dealer's notification to RICOH as is provided in Section 15.1;

    (b) The mutual acceptance and subsequent execution and delivery of a successor Office Products Retail Dealer Sales Agreement (or similar document) memorializing the agreement of the parties; or

    (c) The provision, by RICOH, of at least sixty (60) days prior written notice, to the effect that RICOH, in its discretion and sole judgment has determined that it shall not offer Dealer a successor Office Products Retail Dealer Sales Agreement but shall allow the existing Agreement (as extended) to expire on the last day of the second (2d) month immediately following the month in which the RICOH notice is provided.

**15.5 RICOH may, at its option, _immediately_ terminate this Agreement in the event of:**

    **(a) the sale or transfer of all or a substantial portion of the assets of Dealer;**

    **(b) a merger or consolidation to which Dealer is a party; or**

    **(c) a transfer of all or any part of the equity securities or other interest of the current principals of Dealer so as to result in a change in the ownership, effective voting control or management of Dealer.**

15.6 Upon any termination or expiration of this Agreement, RICOH may elect to cancel any or all unfilled orders and may elect to repurchase from Dealer all or any portion of Dealer's inventory of then current Authorized Products contained in cartons that have not been opened, at the invoice price to Dealer as determined from RICOH's records.

    (a) In addition, Dealer shall resell to RICOH any other Authorized Products which RICOH elects to repurchase, at the invoice price to Dealer.

    (b) RICOH shall make transportation arrangements for moving said inventory from Dealer's premises after Dealer has prepared such inventory for shipment, and RICOH shall assume the transportation costs involved.

    (c) Dealer shall prepare such inventory for shipment within thirty (30) days of RICOH's election to repurchase such inventory.

    (d) In addition, upon any such termination or expiration, Dealer shall return any and all promotional or other materials furnished by RICOH upon RICOH's written demand.

15.7 Subsequent to any termination or the expiration of this Agreement, RICOH will sell to Dealer, at Dealer's request, on a cash basis only, subject to reasonable availability, reasonable quantities of Consumable Supplies and Replacement Parts for such quantities of the Authorized Products which RICOH's records indicate have been installed within Dealer's Territory by Dealer prior to the effective date of termination or expiration.

15.8 Any termination or the expiration of this Agreement shall in no way affect the rights and liabilities of either Dealer or RICOH arising during the effective period of this Agreement or release either party from the obligations it incurred during such period.

15.9 In the event it shall become necessary for RICOH to retain the services of an attorney for the purpose of enforcing any of the payment provisions of this Agreement, Dealer shall pay to RICOH, in addition to any other moneys due and payable, all costs of suit and a reasonable attorney's fee.

## SECTION 16.    STRATEGIC PRODUCTS CONTROLS

16.1 When RICOH, or its designee, advises Dealer that an Authorized Product, which Dealer sells or markets, is, or will be, defined as a _Strategic Product_ or that such Authorized Product does or may contain or use _Strategic Technologies_ the parties agree that the following legend will be printed on or affixed to the exterior of packages, User's Guides and Service Manuals for such Authorized Products.

"THESE PRODUCTS ARE *"STRATEGIC PRODUCTS"* SUBJECT TO THE COCOM REGULATIONS. EXPORT OF THESE PRODUCTS WITHOUT COMPLIANCE WITH EXPORT PROCEDURES AND REGULATIONS IS EXPRESSLY PROHIBITED."

16.2 In the event that Dealer, or the end-user, wishes to export a *Strategic Product*, or a product which contains *Strategic Technologies*, Dealer (or the end-user) agrees to comply with the **Export Administration Act**, and its enacting regulations, of the United States.

## SECTION 17.    REPLACEMENT PARTS AND CONSUMABLE SUPPLIES AVAILABILITY

17.1 Notwithstanding anything to the contrary contained in this Agreement, RICOH's obligation to provide Replacement Parts and Consumable Supplies to Dealer for any Authorized Product shall be for the earlier of:

   (a) five (5) years from the date of the last shipment (based on RICOH's records) of the Authorized Products which Dealer was, or is, authorized to sell and service; or
   (b) three (3) years from the date of the expiration or termination of the latest Office Products Retail Dealer Sales Agreement in effect between RICOH and Dealer.

17.2 After the end of the applicable term described in Section 17.1 above, RICOH may supply such Replacement Parts and/or Consumable Supplies to Dealer but shall have no obligation to do so.

17.3 If RICOH elects to provide such Replacement Parts and Consumable Supplies to Dealer after the end of the applicable term described in Section 17.1, it shall do so only in accordance with RICOH's terms and conditions in effect at the time of such sale.

## SECTION 18.    GENERAL PROVISIONS

18.1 Dealer and RICOH agree that this Agreement, all documents issued in connection therewith and any dispute or controversy, shall be governed by and interpreted in accordance with the laws of the State of New York. Dealer and RICOH agree that any appropriate state or federal district court located in the Borough of Manhattan, County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and any judgment of such court shall be enforceable in any court having jurisdiction over the party against whom such judgment is rendered. Service of process on either party may be made by certified mail, return receipt requested, at their respective addresses as provided herein. **The parties specifically waive any right to a jury trial.**

18.2 The failure of Dealer or RICOH at any time to exercise any of their respective rights under this Agreement shall not be deemed a waiver, nor shall such failure in any way prevent Dealer or RICOH from subsequently asserting or exercising such rights. No waiver or modification of any of the terms of this Agreement shall be effective unless in writing and signed by an officer of each party.

18.3 All communications issued pursuant to, or required by, this Agreement shall be ineffective unless in writing and signed by the party originating such communication. Where this Agreement requires a communication from RICOH, such communication shall be ineffective unless in writing and signed by a corporate officer, or a person designated in writing by a corporate officer.

18.4 Notices as to disputes or termination to be given under this Agreement shall be signed by the party giving such notice and mailed by certified or registered mail (postage pre-paid), return receipt requested and addressed to the party to be notified at the address set forth below or as subsequently changed by giving notice. Notices as to address changes, pricing changes, warranty changes and other matters relating to policy and business may be given to such addresses, by telex, telegram, facsimile or first class mail. Notices by mail shall be deemed given three (3) days after mailing.

(a) Ricoh Address:                              (b) Dealer Address:

RICOH CORPORATION                    GENESIS OFFICE SYSTEMS, INC.
5 Dedrick Place                               940 MADISON AVE.
West Caldwell, NJ 07006                 BALTIMORE, MD 21201

ATTENTION: Jim Coriddi Vice President      ATTENTION: Mr. Ron Hawkins
              Marketing Support Group

Tel: (973) 882-2000                          Tel: (410) 225-0500
Fax: (973) 882-2179                          Fax: (410) 669-9230

18.5 Both RICOH and Dealer shall act as principals in all respects concerning this Agreement and neither shall act or hold itself out as the agent, partner or joint venturer of the other. The relationship between RICOH and Dealer is strictly that of buyer/seller and nothing contained herein is intended to create nor shall it be construed to create any other relationship including, but not limited to, a franchise, agency, partnership, joint venture or otherwise.

18.6 If any term or provision of this Agreement, or its application to any person or circumstances, shall be adjudicated, by a court of competent jurisdiction, as invalid or unenforceable, the remainder of this Agreement, or its application to any person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected, and each remaining term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

18.7 Dealer may not assign this Agreement or any of Dealer's rights under this Agreement, nor may Dealer delegate any of its duties under this Agreement except with RICOH's prior written consent, which Ricoh may grant or withhold in its sole discretion.

18.8 This Agreement is intended to be a final expression, and a complete and exclusive statement regarding the subject matter of this Agreement and supersedes any prior oral statements or written agreements (including, but not limited to, any prior Office Products Retail Dealer Sales Agreements) between the parties. Schedules and Exhibits attached hereto or referenced herein, including, without limitation, the RICOH Dealer Service Policy Manual and the terms and conditions of the RMAP and DMAP Maunuals, shall be deemed to be part of this Agreement and shall be complied with by Dealer as if fully set forth herein.

**This Agreement** shall become effective only upon the execution by an authorized officer of both Dealer and RICOH.

RICOH CORPORATION:                      DEALER:

Signature: _____      Signature: _____

Print Name: _____      Print Name: _R.N. HAWKINS_

Title: _____       Title: _PRES._

Date: _____        Date: _9-30-02_

## CERTAIN DEFINITIONS

(1)     The terms "acquire" or "acquiring" (or any other derivative of acquire), when used in connection with the Authorized Products, mean the purchase, lease or rental of the Authorized Products.

(2)     The term "COCOM" means the Coordinating Committee headquartered in Paris, France whose objective is to prevent the build-up of military power in certain designated countries by regulating the flow of certain products and technologies (which may be the Authorized Products) into such designated countries.

(3)     The term "Dealer's Territory" means the area, within the United States, designated in Schedule A as the area assigned to Dealer for the retail sale of the Authorized Products to end-users.

(4)     The term "end-user" means a customer in the United States who is acquiring the RICOH or Aficio™ brand Authorized Products specifically for such customer's own use and needs, and not for resale or distribution.

(5)     The term "Major Account" means:

(a)     an end-user which acquires or which expresses an interest in acquiring four (4) or more RICOH or Aficio™ brand office machine products to be installed in each of two (2) or more end-user sites within the United States (whether within or outside Dealer's Territory); or

(b)     an end-user which acquires or expresses an interest in acquiring ten (10) or more RICOH or Aficio™ brand office machine products to be installed at end-user site(s) in the geographic, or otherwise, territory assigned to an authorized RICOH dealer or RICOH Branch ; or

(c)     an account of:
(1) the Government of the United States of America, its agencies, departments, or branches; or
(2) any state or local (city or county) government, governmental agency, political sub-division or branch; or
(3) any person or entity entitled to acquire the Authorized Products under or pursuant to any contract with any such account described in Paragraph 5(c)(1) or (2) of these Definitions.

(6)     The terms "market" or "marketing" (or other derivative of market) mean the local promotional activities of Dealer carried out within the Dealer's Territory which are intended to result in the acquisition of the Authorized Products by end-users within the Dealer's Territory.

(7)     The term "Retailer" means any entity authorized by RICOH to sell RICOH or Aficio™ brand office equipment products to end-users at retail prices in a designated area within the United States.

(8)     The terms "sell", "selling", "sold", or "sells" (or other derivatives of sale or sell) means the retail sale, lease or rental of the Authorized Products by any Retailer, including Dealer, to end-users (as defined in Paragraph 4 above).

(9)     The term "*Strategic Products*" means those goods or products, which may be RICOH or Aficio™ brand Authorized Products covered by this Agreement, whose direct or indirect export to certain designated countries is forbidden by the *Export Administration Act*, and its enacting regulations, of the United States.

(10)    The term "*Strategic Technologies*" means the proprietary technology which is contained, or is utilized, in those goods or products, which may be RICOH or Aficio™ brand Authorized Products covered by this Agreement, whose direct or indirect export to certain designated countries is forbidden by the *Export Administration Act*, and its enacting regulations, of the United States.

(11)    The term "Service Representative" with respect to any Authorized Product means an individual who has been certified by RICOH as having successfully completed a RICOH Authorized Technical Training Program for such Product.

(12)    The term "Warranty Service" means the repair or replacement of the Authorized Products during the Warranty Period.

# OFFICE EQUIPMENT INSTALLATION REPORT

EALER: _____    MONTH OF: _____

AREA: _____

| MODEL | INSTALLATIONS | | | | |
|---|---|---|---|---|---|
| | LEASE AND/OR PURCHASE | RENTAL | SALES TOTAL WITHIN AREA | TOTAL WITHOUT AREA | * INVENTORY AT CLOSE OF MONTH |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Including physical inventory, trial and demonstration units.

## SALES MANPOWER

ELLING RICOH LINE ONLY: _____

ELLING RICOH AND OTHER LINES: _____

ELLING OTHER LINES ONLY: _____

EALER'S SIGNATURE: _____    DATE: _____

14

# EXHIBIT C



January 14, 2003

Savin Corporation

333 Ludlow Street
P.O. Box 10270
Stamford, CT 06904-2270

Dealer Group
(203) 967-5058
SAVINFAX (203) 967-5086

Mr. Ron Hawkins
President
GENESIS OFFICE SYSTEMS INC
940 Madison Avenue Suite 100
Baltimore, MD 21201

Dear Mr. Hawkins,

We are pleased to renew you as one of Savin Corporation's dealers and enclose a signed copy of your Dealer Agreement(s). Your account number is 29057109. We have established your account with a $35,000 credit line.

Terms of sale for orders refers to the pre-set time frame for expected payment of an invoice and the discount available if these conditions are met. Please refer to Paragraph 7 of the contract for payment terms and conditions.

You will be receiving a monthly statement of account, which will reflect all outstanding debts as well as credits on your account. Your statement of account must be current to qualify for any discount program offered by Savin.

Please note some key contacts for any questions you may have:

Dealer Sales Manager: Robert Tomsic, Phone: 412-680-8812

To Place Orders: Marty Haynes, Phone: (800) 844-8961 Fax: (412) 490-9432

Questions regarding statements, invoices or discounts Sue Faiez, Phone: 203-967-5046

We look forward to a very successful relationship, and we are always available to assist you with your account.

Sincerely,

Gail DiBiase
Dealer Administrator

cc:    Don Michelucci
       Fred Berger
       Al Baldi
       Jan Saperstein
       Robert Tomsic

**SAVIN CORPORATION**
**DEALER AGREEMENT**
**GESTETNER BRAND**

THIS AGREEMENT is made as of **December 12, 2002**, between Savin Corporation ("Savin") and **GENESIS OFFICE SYSTEMS INC** ("Dealer").

Dealer desires to market certain Gestetner brand products at retail prices to end-user customers within Dealer's Territory (defined below), and to provide service for such products in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants in this Agreement, Savin and Dealer agree as follows:

1.    **Statement of Purpose.** The purpose of this Agreement is to promote and achieve in Dealer's assigned territory the effective retail sale, rental and lease ("sale") and servicing by Dealer of Gestetner brand (i) **Copier, Copyprinter, Color, Fax** and related accessories designated on Schedule A attached hereto and such additional products as Savin shall, in its sole discretion, designate by written notice to Dealer (collectively, the "Machines") and (ii) supplies and parts sold by Savin ("Supplies"). Machines and Supplies are collectively referred to in this Agreement as "Products."

2.    **Appointment.** Savin appoints Dealer as an authorized retail seller of the Products. Dealer's primary responsibility shall be to market the Products on a retail basis within the bounds of the territories designated on Schedule B attached hereto (collectively, the "Territory"). Such appointment is not exclusive, and Savin may in its sole discretion, at any time and without cause or notice, market its Products, or appoint other retailers whose primary responsibility may be to market and sell the Products in all or a portion of the Territory. Any such additional appointments shall not operate as a termination or cancellation of this Agreement.

(a)    Dealer shall not sell or otherwise market the Products at wholesale prices and specifically warrants and commits that all sales will be at retail prices.

(b)    Savin may discontinue the sale of or may change, modify or alter, any Products upon notice to Dealer.

3.    **Operating Standards.**

(a)    **Minimum Purchase and Sales.** Dealer will use its best efforts to develop diligently the retail sale of Products to their full potential within the Territory; will develop and maintain the potential for such sales; and will obtain a market share for Machines acceptable to Savin. Whether Dealer has satisfied this operating standard will be determined principally by reference to the Quota (defined below). Dealer agrees to purchase from Savin and sell, lease or rent to bona fide retail end users that are located in the Territory (each, a "Customer", and collectively, the "Customers") the quantities of Machines designated on Schedule C to this Agreement (the "Quota"). Dealer will engage in the sale, rental and service of Products only from its authorized sales and service location and only to Customers.

(b)    **Authorized Sales and Service Location.** In order to provide Product presentation commensurate with the goodwill attached to the name Savin and the Gestetner brand, and to provide prompt and effective service, Dealer will adequately equip, decorate and furnish its authorized sales and service location for the display, sale and service of Products, and maintain and staff that location with experienced, trained and competent personnel in all departments during normal business hours. The authorized sales and service location from which Dealer may sell and service Products under this Agreement is shown on Schedule D attached hereto.

2

(c)    **Ownership and Management Participation.** In order to induce Savin to enter into and continue this Agreement, Dealer represents that during the term of this Agreement, its present owners and management will continue in the ownership of Dealer and the operation of the authorized sales and service location designated in this Agreement.

(d)    **Warranty.** The sole warranty issued by Savin to Dealer with respect to Products designated under this Agreement is that set forth in Savin service manuals and publications, as amended from time to time.

(e)    **Service.** Dealer acknowledges the importance of prompt, effective and courteous service and undertakes to render such service to all Gestetner brand customers in the Territory and in accordance with operating standards and guidelines established from time to time by Savin. To this end, Dealer will organize and maintain a service department and employ a sufficient number of service personnel trained to install and service all Machines sold by Dealer, and Machines placed by Savin or others with customers in the Territory. To insure that Customers receive effective service, Dealer shall cause service personnel to attend, in accordance with Savin guidelines and programs, service-training courses offered and approved by Savin, and Dealer will furnish to such employees Savin approved training and service manuals and bulletins. Dealer shall expeditiously investigate and courteously handle all Customer complaints.

Dealer will not install or service Machines at any location outside the Territory. In the event a Customer requests service outside the Territory, Dealer shall inform Customer that Dealer does not provide such service, and will refer the Customer to the authorized Gestetner brand dealer or branch office of Savin responsible for service in the territory where the Customer location is situated. In the event Dealer receives such a reference to provide service on a Gestetner brand copier, Dealer shall promptly and efficiently provide such service on reasonable terms and conditions and as required by this Agreement.

(f)    **Reports and Records.** Within ninety (90) days of the end of Dealer's fiscal year, Dealer will furnish Savin with copies of Dealer's balance sheet, income statement and statement of sources and application of cash for each of the Dealer's fiscal years ending during the term of this Agreement, which are certified, reviewed or compiled by Dealer's independent auditor. At other times, as Savin may reasonably require, Dealer shall provide Savin with its most recent statement of Dealer's business, operations and financial condition. The failure or refusal to supply such financial information as Savin reasonably may request may cause Savin to believe that Dealer's creditworthiness is diminished or Savin may deem itself insecure. In such event, Savin may elect any or all of the remedies set forth in Section 7 below.

4.    **Orders.** Dealer will submit written orders for Products. The form of those orders will comply with policies and procedures established by Savin from time to time. All orders are subject to approval and acceptance by Savin.

5.    **Prices.** Savin will notify Dealer from time to time of the prices, charges and terms and conditions of purchase of Products, and will invoice Dealer for Products at dealer prices in effect at the time of delivery.

6.    **Security Interest and Risk of Loss.** Savin shall have a security interest under the Uniform Commercial Code in Products sold to Dealer, and their proceeds, until Savin shall have been paid in full for such Products. Dealer will execute, and Savin is hereby authorized as attorney-in-fact to execute and deliver on behalf of Dealer, and file any and all financing statements and other instruments which Savin may deem necessary and desirable to perfect and protect such security interest. Savin or its agents shall have the right to enter the premises of Dealer during business hours and retake possession of Products delivered to, but not paid for by Dealer.

Dealer shall bear all risk of loss or damage to Products and all costs, insurance premiums, freight and all other charges and expenses incurred after Savin places the Products in the custody of a carrier at Savin's warehouse loading dock for delivery to Dealer. Savin shall have no responsibility for any damage

3

caused to Products during shipment to Dealer. It shall be the sole responsibility of Dealer to file appropriate claims for reimbursement with the carrier. All claims for Products asserted to be defective at the time of shipment shall be made within ten (10) days after receipt thereof, and the Dealer shall return such Products or representative samples thereof to Savin, transportation prepaid. Upon receipt, Savin will inspect the particular product, and if in its reasonable judgment Savin determines that any defect existed at the time of shipment, it will, at its sole option, either repair or replace the particular product with the like kind and return the repaired product or its replacement to Dealer, with all transportation charges to be borne by Savin, or it will credit Dealer with its costs, including all transportation charges.

7.    **Payment for Products.** Dealer shall pay Savin for all invoices for Products in accordance with (i) the terms set forth on Savin price lists; and (ii) Savin credit and collection policies and procedures, in each case subject to modification from time to time by Savin. Dealer shall comply with published credit and collection policies of Savin.

If Dealer does not pay to Savin amounts owing to Savin pursuant to this Agreement, within the time specified by Savin, Dealer agrees to pay a late payment charge on such overdue amount from the due date thereof until paid in full at the interest rate as Savin may from time to time establish in writing; provided, however, that in no event shall such rate exceed the maximum allowable rate of interest permitted by law. As of the date of this Agreement and until written notice is provided to Dealer by Savin modifying such interest rate, the interest rate charged by Savin on any overdue accounts equals one percent (1%) per month or twelve percent (12%) per annum.

In addition, if Dealer fails to make such payment when due, or if Savin has good cause to believe Dealer's creditworthiness is diminished, or if Savin deems itself insecure:

(a)    Savin may reduce, modify or eliminate Dealer's credit line with Savin; or

(b)    Savin may decline to accept further orders from Dealer or to make further deliveries to Dealer until such deficiency is cured; or

(c)    Savin may elect to make further deliveries only on a cash on delivery basis; or

(d)    Savin may require Dealer to provide adequate written assurance of Dealer's continued performance prior to making any further deliveries to or for the account of Dealer.

Subsequent to the exercise of any of the remedies listed above, Savin will sell to Dealer on a cash in advance basis, subject to reasonable availability, reasonable quantities of Supplies for such quantities of the authorized Products which Savin's records indicate have been installed within Dealer's Territory by the Dealer prior to the effective date of the exercise of Savin's remedies.

8.    **Major Accounts.** Dealer recognizes and acknowledges that in order for Savin and its dealers to market the Products successfully, it is desirable for Savin to offer, sell and rent Products to certain customers ("Major Account Customers") under its Commercial and Industrial, Government Education and Medical, and Federal Marketing Development plans, and other or similar plans which may be developed from time to time ("Major Account Programs"). Dealer acknowledges that Savin has the right, pursuant to such Major Account Programs, directly and indirectly to sell and rent Machines, and to sell Supplies and service through national or branch offices, or other sales representatives, facilities or agencies, to any person, firm or corporation within or outside the Territory, at prices or on terms and conditions which may vary from those at which Savin sells to other customers, Dealer and other dealers.

Dealer agrees to provide assistance to and cooperate with Savin in the solicitation of orders from all Major Account Customers and in the sale and service of Machines and Supplies placed under Major Account Programs in the Territory and elsewhere, and to comply with bulletins, instructions and policies which may be issued from time to time by Savin in furtherance of such Major Account Programs and which are incorporated

4

herein by reference. Dealer will promptly communicate issues and disputes with customers, provide meter readings, and provide all other reasonable assistance to Savin in order to develop a good relationship and resolve any issues or disputes with Major Account Customers.

Dealer understands and agrees that it is without authority to, and shall not, modify or change any term or condition of any sale or contract described in this Section 8. Dealer agrees to indemnify Savin against and to hold Savin harmless from all lost profits, costs, expenses, liabilities or damages, including reasonable attorney's fees, incurred or paid by Savin arising from Dealer's non-compliance with this Section 8 (including, without limitation, lost profits, costs, expenses, liabilities or damages arising from price reductions and price rebates which Savin is required to grant due to Dealer's non-compliance with such Sections or arising from personal injuries and property damage due to Dealer's improper installation or servicing of Products). Savin reserves the right to remove Dealer as a participating Major Account Program service and sales location if such Dealer does not represent Savin in accordance with the terms of Savin's Major Account Program.

In the event of sales or rentals by Savin under such Major Account Programs, Dealer may receive or be allowed such commission as Savin in its sole discretion may deem appropriate, taking into account the circumstances of such sale, including the place of demonstration, installation, sale, and prior contact by Dealer with the customer, all in accordance with the Major Account Programs.

9.      **Termination.**

(a)      Dealer may at any time terminate this Agreement, with or without cause, upon thirty (30) days prior written notice to Savin.

(b)      Savin may terminate this Agreement prior to its expiration date of October 31, 2003, by written notice to Dealer sent by certified mail, return receipt requested, effective sixty (60) days from the date of notice if Dealer fails to substantially comply with any material term or condition of this Agreement and fails to cure such deficiency within said sixty (60) day period after such Savin notice.

(c)      Notwithstanding the above, Savin may terminate this Agreement by written notice to the Dealer sent by certified mail, return receipt requested, effective twenty (20) days from the date of the notice if the Dealer becomes delinquent in payment of any account owed to Savin and fails to cure such delinquency within said twenty (20) day period after such notice, or if Dealer becomes insolvent, makes an assignment for the benefit of creditors, or files or has filed against it a petition in bankruptcy.

(d)      Notwithstanding the above, Savin may terminate this Agreement by written notice to Dealer sent by certified mail, return receipt requested, effective immediately from the date of the notice if Dealer makes any material misrepresentation as to the ownership, management or business operations of Dealer, or upon the liquidation, dissolution, merger, consolidation or change of management or ownership of capital stock of Dealer without Savin's prior written approval.

(e)      This Agreement shall expire by its terms on October 31, 2003; provided, however, that in the absence of a replacement agreement, Savin and Dealer may agree in writing to continue their relationship on a month-to-month basis pursuant to the terms and conditions of this Agreement as in effect on December 12, 2002, until the earlier to occur of:

(i)      Dealer's notification in writing of its intention to discontinue its relationship with Savin.

(ii)      the acceptance and subsequent execution by Savin and Dealer of a successor Dealer Agreement; or

(iii)      the provision, by Savin, of 30 days prior written notice that this Agreement (as extended) shall expire at the end of such 30-day period.

5

In the event it shall become necessary for Savin to retain the services of an attorney for the purpose of enforcing any of the provisions of this Agreement, Dealer shall pay to Savin, in addition to any other monies due and payable, all costs of such suit and reasonable attorney's fees.

10.    **Effect of Termination or Expiration.**

(a)    Upon the expiration or termination of this Agreement for any reason:

i)    Dealer shall not engage in any activity which might imply or represent that it is an authorized Gestetner brand dealer, and shall, at its sole expense, take all steps necessary to remove any listing in any telephone directory or other publication that it is an authorized Gestetner brand dealer;

ii)    Dealer shall, at its sole expense, discontinue the use of Gestetner brand trademarks, trade names, labels and copyrights and materials and signs bearing the name Savin or Gestetner or any other trademark or trade name of Savin, and will remove such names and trademarks from letterheads, stationery and other forms used by Dealer;

iii)    The acceptance of any order from Dealer or the sale of any Product to Dealer after termination shall not be construed as a renewal or extension, nor as a waiver of termination;

iv)    Termination shall be without prejudice to the rights of either party for moneys due or to become due under this Agreement or to obtain Dealer's compliance with this Agreement; and

v)    Dealer acknowledges that its breach of the obligations of this Paragraph 10 and of Paragraph 11 will cause Savin irreparable injury, and consents to the issuance of preliminary and final injunctive relief to obtain or enforce Dealer's compliance with this Agreement.

(b)    Upon termination or expiration of this Agreement by Savin:

i)    Savin may repurchase from Dealer, upon written request made by Dealer within 30 days of termination all new, unused and undamaged Products in unopened boxes purchased by Dealer from Savin within the last twelve (12) months at the invoice price actually paid by Dealer for such Products, subject to Savin's then current re-stocking fee policy;

ii)    Savin may repurchase from Dealer, upon written request made by Dealer within 30 days of termination or expiration all special tools and parts in usable and good condition purchased by Dealer from Savin during the term of this Agreement at a price to be mutually agreed upon by Dealer and Savin; and

iii)    Savin will sell to Dealer, on a cash in advance basis, for a period of three (3) years after notice of termination, at the highest dealer price in effect at the time of such sales, Supplies of the type sold to Dealer during the term of this Agreement, in quantities determined solely by Savin in the exercise of its business judgment. Savin will take into consideration, in the exercise of its judgment, the volume of Supplies sold by Savin to Dealer for Dealer's customers in the Territory during the one year period immediately prior to the termination or expiration. The sale of any parts and supplies under this subparagraph (iii) will not constitute, in whole or in part, a dealer relationship between Savin and Dealer, or the reaffirmation or extension of this Agreement; provided, however, that the terms and conditions of Paragraphs 3(f), 4, 5, and 6 of this Agreement shall apply to the purchase and sale of such Supplies.

11.    **Trademarks.**

(a)    Dealer acknowledges that Savin has the exclusive ownership rights in and to use the Gestetner brand trademarks, service marks and trade name in connection with the sale and service of Products, and agrees it shall never contest such rights.

6

(b)    Dealer is hereby granted a non-exclusive right to use Gestetner brand trademarks and service marks in connection with the sale and service of Products under this Dealer Agreement. The term of such right shall terminate upon the termination or expiration of this Agreement.

(c)    Dealer shall sell Products only under Gestetner brand trademarks, in accordance with instructions as shall have been issued from time to time by Savin. Dealer shall not remove trademarks or serial numbers from or alter any of the products or engage in any other activity which will in any way tend to impair the reputation of Savin. Dealer will not use or adopt any name, trade name, trading style or commercial designation used by Gestetner brand, or use the word Savin or Gestetner in Dealer's trade or corporate name. Dealer shall not remove, alter, or in any way tamper with any name, plate, number or description of any of Gestetner brand Products, or with the packaging in which any of the Gestetner brand Products is enclosed. Dealer may not add or apply any other name or description to any of the Gestetner brand Products unless it shall first obtain the written permission of Savin to do so. Savin reserves the right to inspect Products and replace such goods where they are non-conforming.

(d)    Dealer agrees to discontinue immediately, at its sole cost and expense, any use of Gestetner brand trademarks and service marks which, in the sole judgment of Savin, is inconsistent with the reputation and standing of Savin, or with the business, advertising or public relations policies of Savin, or is misleading or confusing as to the rights or status of Dealer under this Agreement or otherwise.

12.    **Strategic Products Controls.** Savin or its designee may advise Dealer that certain Products which Dealer is authorized to sell are or will be "Strategic Products" or that such Products contain or use "Strategic Technologies". The term "Strategic Products" means those goods or products, whose direct or indirect export to certain designated countries is forbidden by the Export Administration Act, and its enacting regulation, of the United States. The term "Strategic Technologies" means the proprietary technology which is contained in or is utilized in goods or products, which whose direct or indirect export to certain designated countries is forbidden by the above-referenced laws.

When Savin or its designee advises Dealer that certain Products which Dealer is authorized to sell is or will be a Strategic Product or that such Products contain or use Strategic Technologies, the parties agree that the following legend will be printed on or affixed to the exterior of packages, User's Guides and Service Manuals for such products.

"THESE PRODUCTS ARE "STRATEGIC PRODUCTS" SUBJECT TO THE COCOM REGULATIONS AND EXPORT OF THESE PRODUCTS WITHOUT COMPLIANCE WITH EXPORT PROCEDURES AND REGULATIONS IS EXPRESSLY PROHIBITED."

In the event Dealer or the end-user wishes to re-export Strategic Products, Dealer (or the end-user) agrees to comply with the Export Administration Act, and its enacting regulations, of the United States.

13.    General Provisions.

(a)    Dealer Not An Agent. The relationship provided for in this Agreement is that of seller and buyer, and neither Dealer nor the employees of Dealer shall be considered employees or agents of Savin for any purpose whatsoever. Dealer is not granted any express or implied right or authority to assume or to create any obligation or responsibility on behalf of or in the name of Savin or to make any representation of any kind on behalf of Savin, except for the warranties of Savin with respect to Machines and drums.

(b)    Assignment. Neither this Agreement nor any right or interest in or under this Agreement may be hypothecated, pledged, assigned, subdivided, or transferred ("Dealer Assignment") by operation of law or otherwise by Dealer. Any purported Dealer Assignment is in violation of this Agreement and is void. Notwithstanding the foregoing, Savin may assign any or all of its interest, rights and obligations under this Agreement to any firm or corporation, but such    assignment shall not relieve Savin of its obligation to

7

pay Dealer any sums of money due or to become due to Dealer prior to the effective date of such assignment.

(c)    Force Majeure.  Savin shall use its best efforts to make prompt and timely shipments of orders submitted by Dealer, but shall not be liable for the failure to provide Products or for the delay in shipment of the Products where such failure or delay is the result of strikes, lockouts, accidents, fire, delays in manufacture, transportation or delivery of materials, acts of God, embargoes, government or judicial actions or any other causes beyond Savin's reasonable control.

(d)    Governing Law; Jurisdiction.  The subject matter of this Agreement, including without limitation its execution, content, meaning, performance, alleged breach and/or termination, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements wholly executed and performed in New York.  Savin and Dealer agree that any appropriate state or federal district court located in the County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement.  Service of process on either party may be made by certified mail, return receipt requested, at their respective addresses as provided herein.

Without in any way altering or expanding the Dealer's remedies pursuant to the Exclusive Warranty to Dealers, the total amount of damages recoverable in such action or proceeding shall be limited to the actual damages found by such court to have been caused by the losing party to the prevailing party, notwithstanding the limitation of remedies and liability set forth in Savin's Exclusive Warranty to Dealers for Copier, Copyprinter, Color, Fax .  THE PARTIES SPECIFICALLY WAIVE ANY RIGHT TO A JURY TRIAL, AND ANY ACTION OR PROCEEDING WILL BE TRIED TO A COURT SOLELY BEFORE A JUDGE WITHOUT A JURY.

(e)    Severability.  If any term or provision of this Agreement shall to any extent be found to be invalid, void or unenforceable, the remaining terms and provisions shall nevertheless continue in full force and effect.

(f)    Notice.  Notice given under this Agreement by Savin or Dealer shall be in writing signed by Savin or the Dealer and addressed to the address set forth below on the signature page or as subsequently changed by giving notice.  Such notice shall be effective (i) when mailed if sent by certified or overnight mail, telex or telegram, facsimile or overnight delivery and (ii) when received, if sent by first class mail.  Notwithstanding the foregoing, notice in the form of a Savin dealer bulletin or other form of Savin transmittal to dealers in general shall be deemed to be given by Savin and received by Dealer when mailed by first class mail.

(g)    Communications.  All notices and written instruments issued pursuant to, or required by, this Agreement shall be ineffective unless in writing and signed by the party originating such communication.  Where this Agreement requires a communication by Savin, such communication shall be ineffective unless in writing and signed by Savin's President or a Vice-President, or a person designated in writing by Savin's President or Vice-President.

(h)    Hold Harmless.  Dealer shall indemnify and hold Savin, its officers, directors, shareholders, employees and agents harmless from and against any liability, loss, cost, expense or damage howsoever caused by reason of any breach of this Agreement by Dealer or by reason of any injury whether to body, property, business, character or reputation sustained by Savin, its officers, directors, shareholders, employees and agents or to any other person by reason of any act, neglect, omission or default by Dealer.  Dealer shall defend any action to which this indemnity shall apply.  In the event Dealer fails to defend such action Savin may do so and recover from Dealer in addition, all costs and expenses including attorneys' fees in connection therewith.

(i)    Description Headings.  The description headings of this Agreement are inserted for convenience in reference only and do not constitute a part of this Agreement.

8

(j)    Entire Agreement  This Agreement supersedes and terminates any and all prior agreements, oral or written between Savin and Dealer with respect to the sale and servicing of Products; Dealer agrees that it has not relied on any representations, warranties or promises not explicitly stated in this Agreement, that no oral statement has been made to it that in any way tends to modify or waive any of the terms and conditions of this Agreement, and that this Agreement is the entire arrangement between Savin and Dealer with respect to the sale and servicing of Products.  Except as specifically set forth in this Agreement, no part of this Agreement, which is personal in nature, may be waived, amended, modified or supplemented except by a written instrument signed by Savin and by an officer of Dealer in accordance with this Agreement.  In the event of interpretation of, or dispute under this Agreement, or term or any provision of this Agreement, any course of dealing or trade usage or custom, or course of performance shall not be relied on or referred to by Savin or Dealer to contradict, explain or supplement any provision of this Agreement, it being acknowledged by Savin and Dealer that this Agreement is intended to be and is the complete and exclusive statement of the Agreement with respect to its subject matter.  Schedules attached hereto and written communications issued by Savin pursuant to this Agreement, shall be deemed to be part of this Agreement and shall be complied with by Dealer as if fully set forth herein.

IN WITNESS WHEREOF, Savin and Dealer have executed this Dealer Agreement as of the date first above written.

Address:
333 Ludlow Street
Stamford, CT  06904

SAVIN CORPORATION

By:

Name:  Alan R. Nielsen
Title:  Vice President, Dealer Group

Account #: 29057109

Address:

940 Madison Avenue Suite 100
Baltimore, MD   21201

GENESIS OFFICE SYSTEMS INC

State of Incorporation:
MD

By
Name/  Ron Hawkins
Title:    President

9

SAVIN CORPORATION DEALER AGREEMENT
## Schedule A

## SAVIN CORPORATION DEALER AGREEMENT

## Machines Subject To Agreement

### GESTETNER BRAND:

*Monochromatic*

1302, 1302,1502, 1802, 1802D, 2212, 2712, 2913Z, 3227,3502, 3502P, 4502, 4502P, 3355, 3370, 8502, 10502

*Color*

CS225, CS231, CS213d

*Facsimile*

9920, 9940, 9980

*Digital Duplicators*

5308L, 5450, 5490

*Printers*

*DSC38D (DL,DT1,DT2,) , 7026,7032,7145,7010,7006*

# EXHIBIT D

UNREPORTED

IN THE COURT OF SPECIAL

APPEALS OF MARYLAND

No. 02277

SEPTEMBER TERM, 2004

GENESIS OFFICE SYSTEMS, INC.

v.

GESTETNER/SAVIN CORPORATION,
ET AL.

Hollander,
Eyler, Deborah S.,
Barbera,

JJ.

Opinion by Hollander, J.

Filed:   May 3, 2006

RECEIVED

MAY 0 4 2006

VENABLE

24C040005219

This appeal arises from litigation involving companies engaged in the sale and service of office equipment. On June 28, 2004, in the Circuit Court for Baltimore City, Genesis Office Systems, Inc. ("Genesis"), appellant, filed suit against Gestetner/Savin Corporation ("Savin"), RICOH Corporation ("RICOH"), and Advance Office Systems & Supply Co. ("Advance"), appellees. Genesis alleged breach of contract and anticipatory breach of contract as to Savin and RICOH, and tortious interference with prospective advantage against Advance.[1] Advance was promptly served and timely moved to dismiss. On its face, the Complaint suggested that Savin and RICOH were to be served out-of-state, and the summonses issued to them advised that they had sixty days in which to respond.

On August 13, 2004, prior to the expiration of sixty days, appellant filed a "Request for entry of Order of Default." On August 18, 2004, well within sixty days of service upon Savin and RICOH, they moved to dismiss the Complaint. On August 24, 2004, the circuit court entered an Order of Default, which Savin and RICOH then moved to vacate on September 16, 2004.

At a motion hearing on November 22, 2004, the circuit court (Kaplan, J.) vacated the Order of Default; denied appellant's request for a "Temporary Restraining Order and Preliminary Injunction"; and granted appellees' motions to dismiss, without prejudice. This appeal followed.

---

[1] RICOH and Savin are represented by the same counsel, while Advance has its own counsel. However, appellees submitted a joint brief to this Court.

Appellant presents the following questions:

I. Did the circuit court commit error in vacating the Default Judgment entered against Defendants [Savin] and RICOH even though their resident agent was served in Maryland and more than 30 days passed without a response from the Defendants?

II. Did the circuit court commit error in not recognizing that the documents and sworn statements provided by Plaintiff in its pleading, being true, prohibited dismissing the case on motion?

III. Did the circuit court commit error in not recognizing that the forum-selection clause in the parties' agreement was unreasonable due to: [i] no party in the case is located in New York; [ii] all witnesses for the case are in Maryland or near Maryland; [iii] all evidence for the case is in Maryland or near Maryland; [iv] Plaintiff has never sold any of Defendants' products in New York; [v] the key official for Defendants who initiated the breaches of contract came to Washington, D.C. (i.e., near Maryland) to meet with Plaintiff; [vi] Plaintiff has never attended any business meeting in New York with Defendants, and [vii] Plaintiff's entire business is threatened by the wrongs herein and enforcing the forum-selection clause magnifies the wrongs by burdening Plaintiff further financially?

IV. Did the circuit court commit error in not granting Plaintiff a temporary restraining order and preliminary injunction after Defendants placed a nation-wide ban on Plaintiff, stopping its purchase of their equipment even as an independent consumer, because of their exclusive agreement with Defendant Advance?

For the reasons set forth below, we shall affirm.

## I.    FACTUAL SUMMARY

Genesis is a Maryland corporation which, for twenty years, sold and serviced office equipment in Maryland.  Advance, like Genesis, is a Maryland company that sells and services office equipment in Maryland.  Savin and RICOH are out-of-state

2

corporations that supply office equipment to various dealers and
sellers throughout the United States.

### Savin and Genesis

On December 24, 1984, Genesis entered into a "Branch-Dealer
Agreement" with Gestetner Corporation.[2] On January 26, 1999, Savin
entered into a "letter Agreement" with Genesis that said, in part:

> 2. Genesis shall be permitted to purchase up to sixty six
> thousand dollars ($66,000) of Gestetner branded
> equipment, at Savin's low dealer prices (excluding
> special incentives or other special pricing) during the
> six (6) month period beginning on January 1, 1999 and
> ending on June 30, 1999, after which time Savin has no
> further obligation to sell equipment to Genesis.
>
> 3. Genesis shall receive a credit of fifty thousand
> dollars ($50,000) against purchase of Gestetner branded
> equipment and accessories, parts and supplies.

According to Genesis, Savin subsequently met with Genesis to
persuade it to abandon its Baltimore territory. Furthermore,
Genesis alleged that Savin offered Genesis alternative territories
and provided Genesis with a $50,000 credit against purchases of
Gestetner equipment, parts, and supplies. Although Genesis
declined Savin's offer to abandon its Baltimore territory, it
accepted the additional territories and the $50,000 credit.

On December 12, 2002, Genesis entered into a Dealer Agreement
with Savin (the "Savin Agreement"). Under the Savin Agreement,

---

[2] The record does not elucidate the relationship between Savin
and Gestetner, and the parties use the names interchangeably. For
the purposes of this appeal, the precise nature of the relationship
is immaterial.

3

Genesis agreed to market certain Savin products at retail prices to end users, and to service such products. Notably, the parties agreed that any disputes arising under the Savin Agreement would be resolved in accordance with New York law, and by a court of law in the County of New York, State of New York. Genesis also expressly agreed to waive any right to a jury trial.

The Savin Agreement stated, in part:

1. **Statement of Purpose.** The purpose of this Agreement is to promote and achieve in Dealer's assigned territory the effective retail sale, rental and lease ("sale") and servicing by Dealer of Gestetner brand (i) **Copier, Copyprinter,** Color, **Fax** and related accessories designed on Schedule A attached hereto and such additional products as Savin shall, in it sole discretion, designated by written notice to Dealer (collectively, the "Machines") and (ii) supplies and parts sold by Savin ("Supplies"). Machines and Supplies are collectively referred to in this Agreement as "Products."

2. **Appointment.** Savin appoints Dealer as an authorized retailer seller of the Products. Dealer's primary responsibility shall be to market the Products on a retail basis within the bounds of the territories designated on Schedule B attached hereto (collectively, the "Territory"). Such appointment is not exclusive, and Savin may in its sole discretion, at any time and without cause or notice, market its Products, or appoint other retailers whose primary responsibility may be to market and sell the Products in all or a portion of the Territory. Any such additional appointments shall not operate as a termination or cancellation of this Agreement.

(a) Dealer shall not sell or otherwise market the Products at wholesale prices and specifically warrants and commits that all sales will be at retail prices.

(b) Savin may discontinue the sale of or may change, modify or alter, any Products upon notice to Dealer.

4

\* \* \*

9.  **Termination.**

(a) Dealer may at any time terminate this Agreement, with or without cause, upon thirty (30) days prior written notice to Savin.

(b) Savin may terminate this Agreement prior to its expiration date of October 31, 2003, by written notice to Dealer sent by certified mail, return receipt requested, effective sixty (60) days from the date of notice if Dealer fails to substantially comply with any material term or condition of this Agreement and fails to cure such deficiency within said sixty (60) day period after such Savin notice.

(c) Notwithstanding the above, Savin may terminate this Agreement by written notice to the Dealer sent by certified mail, return receipt requested, effective twenty (20) days from the date of the notice if the Dealer becomes delinquent in payment of any account owed to Savin and fails to cure such delinquency within said twenty (20) day period after such notice, or if Dealer becomes insolvent, makes an assignment for the benefit of creditors, or files or has filed against it a petition in bankruptcy.

(d) Notwithstanding the above, Savin may terminate this Agreement by written notice to the Dealer sent by certified mail, return receipt requested, effective immediately from the date of the notice if Dealer makes any material misrepresentation as to the ownership, management or business operations of Dealer, or upon the liquidation, dissolution, merger, consolidation or change of management or ownership of capital stock of Dealer without Savin's prior written approval.

e) *This Agreement shall expire by its terms on October 31, 2003; provided, however, that in the absence of a replacement agreement, Savin and Dealer may agree in writing to continue their relationship on a month-to-month basis pursuant to the terms and conditions of this Agreement as in effect on December 12, 2002, until the earlier to occur of:*

(i) *Dealer's notification in writing*

5

*of its intention to discontinue its relationship with Savin.*

> (ii) *the acceptance and subsequent execution by Savin and Dealer of a successor Dealer Agreement; or*

> (iii) *the provisions, by Savin, of 30 days prior written notice that this Agreement (as extended) shall expire at the end of such 30-day period.*

\* \* \*

13. **General Provisions.**

(d) Governing Law; Jurisdiction. The subject matter of this Agreement, including without limitation its execution, content, meaning, performance, alleged breach and/or termination, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements wholly executed and performed in New York. *Savin and Dealer agree that any appropriate state or federal district court located in the County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement.* Service of process on either party may be made by certified mail, return receipt requested, at their respective addresses as provided herein.

Without in any way altering or expanding the Dealer's remedies pursuant to the Exclusive Warranty to Dealers, the total amount of damages recoverable in such action or proceeding shall be limited to the actual damages found by such court to have been caused by the losing party to the prevailing party, notwithstanding the limitation of remedies and liability set forth in Savin's Exclusive Warranty to Dealers for Copier, Copyprinter, Color, Fax. *THE PARTIES SPECIFICALLY WAIVE ANY RIGHT TO A JURY TRIAL, AND ANY ACTION OR PROCEEDING WILL BE TRIED TO A COURT SOLELY BEFORE A JUDGE WITHOUT A JURY.*

(Italics added; boldface in original).

The Savin Agreement terminated by its terms on October 31, 2003. Nevertheless, Savin and Genesis continued to do business,

although they did not enter to a new written agreement. By letter dated March 24, 2004, Savin notified Genesis of its intent to end the business relationship.[3] Savin's letter stated, in part:

> We write to provide you with notice that the Savin Corporation Dealer Agreement dated December 12, 2002 between Savin Corporation and Genesis Office Systems Inc. will expire (effective 60 days from this notification) by its own terms pursuant to Section 9(e) of the Dealer Agreement.
>
> While the Dealer Agreement does not require that Savin provide notice of such expiration, this letter is provided to you as a courtesy.

### RICOH and Genesis

On September 30, 2002, Genesis entered into a Dealer Sales Agreement with RICOH (the "RICOH Agreement"). Under the RICOH Agreement, Genesis became an authorized retailer for certain types of RICOH office equipment.

Among other things, Genesis agreed that any disputes in connection with the RICOH Agreement would be resolved in accordance with the law of New York, and that any such disputes must be resolved in an appropriate state or federal court located in the Borough of Manhattan, County of New York, State of New York. In addition, Genesis expressly waived the right to a jury trial.

In pertinent part, the RICOH Agreement provided:

> **THIS AGREEMENT**, which is made and entered into as of the effective date shown below, by and between RICOH

---

[3] As we discuss, *infra*, Genesis contends that Savin breached the parties' contract when it notified Genesis, that it would no longer do business with Genesis.

7

CORPORATION ("Ricoh"), a Delaware corporation and GENESIS OFFICE SYSTEMS, INC. a MARYLAND corporation, shall expire by its terms on March 31, 2004 unless sooner terminated pursuant to Section 15 below or unless extended by RICOH.

\* \* \*

## SECTION 1. DEALER'S NON-EXCLUSIVE APPOINTMENT

1.1 RICOH appoints Dealer as an authorized Retailer for only those RICOH or Aficio™ brand office equipment products (the "Authorized Products") which are shown on Schedule B (which is affixed hereto and made a part hereof). Dealer's primary responsibility shall be to market the Authorized Products, on a retail basis only, within the bounds of the mutually agreed marketing Territory and only through Dealer's sales and service location(s) which are shown on Schedule A (which is affixed hereto and made a part hereof). **SUCH APPOINTMENT IS NOT EXCLUSIVE, AND RICOH MAY, IN ITS SOLE DISCRETION, AT ANY TIME AND WITHOUT CAUSE OR NOTICE, APPOINT OTHER RETAILERS** (which may or may not be owned by or under common control with RICOH) **WHOSE PRIMARY RESPONSIBILITY MAY BE TO MARKET RICOH AND/OR Aficio™ BRAND OFFICE EQUIPMENT PRODUCTS (WHICH MAY INCLUDE THE AUTHORIZED PRODUCTS) IN ALL OR A PORTION OF DEALER'S TERRITORY.** Any such additional appointments shall not operate as a diminution, termination or cancellation of this Agreement.

\* \* \*

## SECTION 15. DURATION AND TERMINATION.

15.1 Dealer may at any time terminate this Agreement, with or without cause, upon not less than thirty-(30) day's [sic] prior written notice to RICOH.

15.2 RICOH may terminate this Agreement, prior to its expiration date of March 31, 2004, by written notice to the Dealer, sent by certified mail, return receipt requested, effective sixty (60) days from the date of notice, if Dealer fails to substantially comply with any material obligation of this Agreement and fails to cure such deficiency within sixty (60) days from the date of such RICOH notice.

8

15.3 Section 15.2 notwithstanding, RICOH may terminate this Agreement, prior to its expiration date of March 31, 2004, by written notice to the Dealer, sent by certified mail, return receipt requested, effective ten (10) days from the date of the notice if the Dealer becomes delinquent in payment of any account owed to RICOH and fails to cure such delinquency within ten (10) days from the date of such RICOH notice or if Dealer becomes insolvent, makes an assignment for the benefit of creditors, or files or has filed against it a petition in bankruptcy.

15.4 *In the event this Agreement shall have expired by its terms on March 31, 2004 but neither RICOH nor Dealer shall have notified the other in writing of their intention to discontinue the relationship, then, in such event, this Agreement shall automatically continue in full force and effect on a month-to-month basis and on the same terms and conditions in effect on March 31, 2004 until the earlier of:*

*(a) Dealer's notification to RICOH as is provided in Section 15.1;*

*(b) The mutual acceptance and subsequent execution and delivery of a successor Office Products Retail Dealer Sales Agreement (or similar document) memorializing the agreement of the parties; or*

*(c) The provisions, by RICOH, of at least sixty (60) days prior written notice, to the effect that RICOH, in its discretion and sole judgment has determined that it shall not offer Dealer a successor Office Products Retail Sales Agreement but shall allow the existing Agreement (as extended) to expire on the last day of the second (2d) month immediately following the month in which the RICOH notice is provided.*

15.5 RICOH may, at its option, <u>immediately</u> terminate this Agreement in the event of:

(a) the sale or transfer of all or a substantial portion of the assets of Dealer;

(b) a merger or consolidation to which Dealer is a party; or

(c) a transfer of all or any part of the equity securities or other interest of the current principals of Dealer so as to result in a change in the ownership, effective voting control or management of Dealer.

* * *

9

<u>SECTION 18.  GENERAL PROVISIONS</u>

18.1 *Dealer and RICOH agree that this Agreement, all documents issued in connection therewith and any dispute or controversy, shall be governed by and interpreted in accordance with the laws of the State of New York. Dealer and RICOH agree that any appropriate state or federal district court located in the Borough of Manhattan, County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and* any judgment of such court shall be enforceable in any court having jurisdiction over the party against whom such judgment is rendered.  Service of process on either party may be made by certified mail, return receipt requested, at their respective addresses as provided herein.  **The parties specifically waive any right to a jury trial.**

(Italics added; boldface and underlining in original).

The RICOH Agreement terminated by its terms on March 31, 2004, when it converted to a month-to-month agreement.  However, by letter of April 30, 2004, RICOH notified Genesis of its intention to terminate the parties' business relationship by June 30, 2004.[4] The letter stated, in part:

As you are aware, the Office Products Dealer Sales Agreement (the "Agreement") by and between Ricoh Corporation ("Ricoh") and your dealership expired by its terms on 31 MAR 2004 and was extended on a month-to-month basis.

Ricoh has determined that it will not offer your dealership a renewal contract and, effective 30 JUN 2004, will allow the Agreement to expire.  After that date, your dealership will no longer be authorized to sell Ricoh office products.

<u>Procedural History</u>

---

[4] Genesis contends that RICOH's decision constituted a breach of the RICOH Agreement.

10

As noted, on June 28, 2004, Genesis sued appellees. As to Savin, Genesis alleged breach of contract. As to RICOH, Genesis alleged anticipatory breach of contract. As to Advance, Genesis asserted tortious interference with prospective advantage.

In its Complaint, Genesis identified RICOH as a New Jersey-based entity and Savin as a Pennsylvania-based entity. On its face, the Complaint did not identify a Maryland resident agent for the purpose of service. The caption of the Complaint provided:

GENESIS OFFICE SYSTEMS, INC.
940 Madison Avenue
Baltimore, Maryland

     Plaintiff,

v.

GESTETNER/SAVIN CORPORATION
Southpointe Industrial Park
171 Highpointe Drive
Canonsburg, Pennsylvania 15317

          &amp;

RICOH CORPORATION
Five Dedrick Place
Caldwell, New Jersey 07006

          &amp;

ADVANCE BUSINESS SYSTEMS
10755 York Road
Cockeysville, Maryland 21030

     Defendants.

Notably, the Clerk of the Circuit Court for Baltimore City issued writs for summons, providing for service on Savin and RICOH at their out-of-state addresses. *See* Rule 2-114(b)(3) ("A summons

11

shall contain ... the name of the person to be served as set forth in the complaint...").  The writs advised Savin and RICOH "to file a written response by pleading or motion, *within 60 days* after service of this summons upon you, in this court, to the attached Complaint."  (Emphasis added).  *See* Rule 2-114(b)(6) ("A summons shall contain ... the time within which the defendant must file a response...").  Nevertheless, Genesis sought to serve Savin and RICOH in Maryland, by service upon Corporation Trust Incorporated ("CT").

On July 8, 2004, CT notified Genesis's counsel that it "is not the resident agent for a company by the name of Gestetner/Savin Corporation."  On July 14, 2004, counsel for Genesis responded:

> A few days ago, I received your July 8, 2004 letter, returning the Plaintiff's Complaint against Savin Corporation.  On today, I received the signed return receipt card, indicating that you received the Complaint on **July 8, 2004**.

> Based on your July 8, 2004 letter, you clearly do not know that Gestetner and Savin are connected in business, using both the address in the Complaint and the 333 Ludlow Street, Stamford, CT address to do business.  If you look at exhibit "B" of the Complaint, you will see Savin Corporation entered an agreement with the Plaintiff to sell Gestetner products (Savin's Agent).  In other words, you <u>are</u> the resident agent according to Maryland's Department of Assessments and Taxation.

> I urge you to forward the Complaint in full to Savin Corporation or its lawyers.  *The Plaintiff will file for Default Judgment after 30 days have elapsed, commencing from July 8, 2004* (when you first received the Complaint).

(Italics added; boldface in original).

12

In the interim, on July 30, 2004, Advance filed a motion to dismiss. It argued that Genesis failed to state a claim upon which relief could be granted.

On August 13, 2004, Genesis filed a "Request for Entry of Order of Default." The request came thirty-six days after CT received copies of the Complaint, and well within the sixty days by which, on the face of the writs, Savin and RICOH were told to respond. Genesis asserted that it had "served service of process and Plaintiff's Complaint upon all three Defendants (via their Maryland Resident Agent)" and that only Advance had "filed a motion in response to the Complaint." However, Genesis failed to inform the trial court that the writs provided for service upon Savin and RICOH at their respective places of business outside of Maryland, or that the writs indicated that the responsive pleadings were "due on August 9, 2004."

Five days later, apparently unaware of Genesis's request for an order of default, Savin and RICOH jointly filed a "Motion to Dismiss Genesis's Complaint," and moved to strike Genesis's demand for a jury trial. They asserted:

1.    Plaintiff, Genesis Office Systems, Inc. ("Genesis"), entered into separate written contracts with Savin and Ricoh ....

2.    ... Genesis agreed that any appropriate state or federal district court located in the County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising under or in connection with the contracts. Because Genesis agreed that the subject matter of this dispute must be litigated in New

13

York, ... this Court is not the proper venue for the dispute.

3.  Genesis also agreed that the contracts would expire by their own terms on October 31, 2003, and March 31, 2004.  The Complaint acknowledges that both of the contracts expired in accord [sic] with their terms.  The Complaint, however, is devoid of any factual allegations demonstrating that Savin or Ricoh breached the contracts before they expired.  Accordingly, ... the allegations are insufficient to assert claims for breach of contract.

4.  Genesis also agreed in both of the contracts that it was waiving any right to jury trial....

The docket reflects that, on August 24, 2004, the circuit court (Stewart, J.) entered an Order of Default as to Savin and RICOH.[5]  In addition, the court sent Savin and RICOH a notice that stated, in part:

### NOTICE OF DEFAULT ORDER

TO:

*Gestetner/Savin*
Southpointe Industrial Park
171 Canonsbury, Pennsylvania 15317

OR

333 Ludlow Street
Stamford, Connecticut 06990

**RESIDENT AGENT:** The Corporation Trust Incorporated, 300 E. Lombard Street, Baltimore, MD 21202

*Ricoh Corporation*
Five Dedrick Place,
West Caldwell, New Jersey

**RESIDENT AGENT:**

The Corporation Trust Incorporated, 300 E. Lombard Street, Baltimore, MD 21202

You are hereby notified that an Order of Default has been entered against you in the above entitled case . .

Pursuant to Md. Rule 2-613(d), on September 16, 2004, Savin

---

[5] We have not located the Order of Default in the record.

14

and RICOH jointly moved to vacate the Order of Default. They also asked the court to accept their "Motion to Dismiss Complaint and Motion to Strike Demand for Jury Trial."

On November 15, 2004, Genesis sought a "Temporary Restraining Order and Preliminary Injunction" against RICOH and Savin, claiming: "Unless Defendants GS and Ricoh are restrained by this Court from its nationwide prohibition on the sale of office equipment to Plaintiff, Plaintiff's business will suffer immediate, substantial, and irreparable injury." In their response, Savin and RICOH argued that Genesis offered no evidence that it would succeed on the merits of its case. Moreover, they suggested that the litigation was "brought in an improper venue."

The circuit court (Kaplan, J.) held a hearing on November 22, 2004, to address several motions, including: (1) Advance's motion to dismiss; (2) The motion of Savin and RICOH to dismiss; (3) the motion of Savin and RICOH to vacate the "Order of Default;" and (4) Genesis's request for a "Temporary Restraining Order and Preliminary Injunction." The following exchange is pertinent:

> [COUNSEL FOR SAVIN and RICOH]: First of all, what has now become apparent, one of my clients, Gestetner/Savin, was never even served with a complaint. So, no time period even ran. The second thing, you honor, in regard to my client Ricoh, when the complaint was filed by the Plaintiff in this action, they identified Ricoh, appropriately so, as an out-of-state Defendant, and the Clerk's office issued a summons indicating that, because they were an out-of-state Defendant and that service was to be affected [sic] on my client out of state –
>
> [THE COURT]: 60 days.

15

[COUNSEL FOR SAVIN and RICOH]: 60 days, *my client saw the summons, saw the indication from the Court they had 60 days*, and by the time I got the complaint and saw what had happened, that they had served C.T. Corp., thirty days from the time service had run, we immediately filed a motion to dismiss and, in fact, *even if we only had 30 days, we filed a motion to dismiss six days after the 30th day*.

So, Your Honor, I think even just as a matter of equities, the default should be vacated. *We were at worse six days late in filing the responsive pleading.* But, I think more importantly, Your Honor, *we responded appropriately to the summons that was issued.* And when a party submits a complaint and identifies that service is to be affected [sic] out-of-state, and, in fact, the Court issues a summons to that effect, my client, I believe, should be entitled to rely upon that. And they acted appropriately in the scheme of things, Your Honor, and I would request that the default be lifted.

We didn't even get a copy of the motion for default. That was never even served on us, even though we had filed a motion to dismiss in [sic] this complaint.

[THE COURT]: [Appellant], do you have any objection with setting aside the default?

[APPELLANT'S COUNSEL]: The only thing I would like to share with the Court is, Your Honor, the reason why rule 2-124D provides that service is made upon a corporation by serving its Resident Agent is precisely because of these types of situations. When I served the Resident Agent, the Resident Agent sent it back saying we don't represent them, even though the State of Maryland Department of Taxation and Assessments said that they did. So, why should the Plaintiff be trying to run around and find what is the right address? We served the Resident Agent. The Resident Agent is here is Maryland. The Defendants do much business in Maryland, so we followed the rules. And if you're served in Maryland, you have thirty days to respond. However, Your Honor, I do not want you to think I did not understand the logic of what they're saying. It did say 60 days from the clerk's office.

[THE COURT]: So, I will vacate the default judgment.

(Emphasis added).

16

With regard to the motions to dismiss filed by appellees, we
quote extensively from the hearing:

> [COUNSEL FOR SAVIN and RICOH]: There are three points
> that are asserted in our motion. The first, Your Honor,
> is that in the background between two parties, is there
> was a written contractual agreement, dealer services
> agreement between my client, Savin and Ricoh and the
> Plaintiff. And in each one of those dealer agreements,
> there was a specific provision, it was plain and
> unambiguous, it indicated that any dispute, case or
> controversies that arose out of the relationship between
> the parties, they were, in fact, to be litigated in the
> State of New York. And these are prominent provisions in
> both of these dealer agreements.
>
> As a consequence of that, Your Honor, we move to
> dismiss claiming that this Court should not be the Court
> that has to hear this situation, that this case should,
> in fact, be dismissed and it's up to the Plaintiff as to
> whether or not they want to bring this case in New York.
>
> * * *
>
> Under the law of Maryland, Your Honor, there is, in
> fact, a presumption that for[u]m selection clauses are,
> in fact, valid, and it's the Plaintiff that bears the
> burden of proof in this situation to demonstrate that
> enforcement of the provisions would be unenforceable.
> And the Maryland Court of Appeals has given us pretty
> clear indications as to what is necessary. First, they
> would have to demonstrate that there has been some sort
> of fraud or that the contract was entered into in duress.
> And there is no evidence to substantiates [sic] that nor
> is there even an allegation to substantiate that.
>
> The second thing that the Plaintiff could attempt to
> rely upon to get away from the for[u]m selection
> provision is if they could demonstrate that, in fact,
> they would be denied a remedy if this action were to be
> dismissed and transferred to New York....
>
> What we have asked for and what we believe should
> happen is, if the Plaintiff chooses to file the case in
> New York, one of my clients is a resident of Stamford,
> Connecticut. That's even further away than New York.
> The other client is a resident of Northern New Jersey,
> just on the other side of the Hudson River from New York.
>
> Now this, is a contractual provision which both
> parties agreed to. There has been no claim that the

17

Plaintiffs did not want this provision ... or that they had any objections to it. So there is also no evidence before Your Honor that it would be impracticable for them to litigate this case in New York or that there would be any impediment to them being able to obtain a remedy that they would otherwise be entitled to.

So, Your Honor, I believe that the record before Your Honor is just devoid of any indication to indicate that this case or controversy, to the extent it is arising out of these written provisions, should not be dismissed and up to the Plaintiff as to whether or not they want to transfer to New York....

[THE COURT]: [Appellant], what is your response to the New York venue.

[APPELLANT'S COUNSEL]:

* * *

Your Honor, the unreasonableness of applying this for[u]m selection clause is this: Because of this breach of contract that we are arguing here, my client has a business, my client is in the business of selling and servicing these duplicators. This is all the business he does. So by them breaching the contract and not supplying my client with the agreement that he needed, basically the corporation is threatened in its existence. And consequently, here in this case none of the witnesses are in New York. The entire case, no party is located in New York. All potential witnesses are in Maryland or near Maryland. The Plaintiff has never sold any products in New York. The Plaintiffs [sic] never attended any meetings in New York. The breach herein seeks to destroy Genesis as a corporation. Therefore, to put an additional financial burden on my client to carry this case, transfer witnesses, transfer everything, to New York under these circumstances is quite unreasonable.

*And so, we're not arguing that the for[u]m selection clause was not willingly entered into at the time, because it was, we are simply saying, in light of the kind of breach we have here that threatens this plaintiff as a corporation, it is not reasonable to put an additional burden on my client to carry this to New York.*

Where are the witnesses in New York? Where is the evidence? *Everything is here.* As a matter of fact, the gentlemen who represents Gestetner and Ricoh, came to

Washington, D.C. and met with my client and he's the one, so to speak, who initiated this entire breach and this entire mess we have today. *So my client is really put in a very unreasonable and financially burdensome situation because of the breach.* So, my argument is, if we continue, I will share how clearly they breached the contract and that will give us more light in understanding why this for[u]m selection clause is not proper here.

[THE COURT]: I read your entire complaint and the kind of contract that is involved here is . . . a distribution contract [where either side may] cancel . . . on relatively short notice. . . . I mean, they may have a time in them but — they can be cancelled on like a thirty days' notice and people go on their way. These representatives, sales representatives of contracts or distribution contracts are nothing more than very short — can be very short lived if one side or the other side doesn't want to continue.

[APPELLANT'S COUNSEL]: *There is one unique thing, Your Honor. I don't want the Court to overlook. The written contract did come to a close in 2003, however, they continued to do business with my client.* They continued to sell, service and supply these products for the entire year. We didn't get a letter saying our professional relationship will end in thirty days, until a year later. So they continued to do business. They orally agreed to continue to do business. So, we have another aspect here that is unique in this situation. *So we do have an agreement with Gestetner, Savin now.* Gestetner merged into Savin. *We have continued to do business. Have an oral agreement.* We have contracts showing that business was done, products were sold well after the ending of the written contract. So we have that and we're ready to prove that.

[THE COURT]: *Why would the continuation of business be on terms different than what was in the written contract? In other words, it was month to month after that on the same terms as were in the written contract. You allowed them to terminate on thirty days' notice.*

[APPELLANT'S COUNSEL]: I'm saying, Your Honor, the only difference is they had the right to end the agreement at any time. However, according to language in the written

19

agreement, they did not have a right to end up for the purpose of allowing somebody else to take the territory that my clients [sic] had worked and prepared for 20 years according to the written language of the agreement we're talking about.  The contract would not result in termination of the Plaintiff's agreement in the order to bring somebody else in the territory.  This is where Defendant Advance enters the picture where by [sic] they entered a secret agreement with both Gestetner and Ricoh in order to take the Baltimore territory that the plaintiff had created and worked for 20 years and sold. It is not a situation whereby, you know, we decide we just don't want to continue anymore, gentlemen, that is the end of our professional relationship.  No.  Advance, as early as 1998, according to the documents I have, entered a secret agreement with them to have this exclusively.  How can you enter a secret agreement to have the Baltimore territory exclusively when Genesis is already in the Baltimore territory by contract? ....

[THE COURT]: Isn't there - Genesis did not agree to give up - you're saying Genesis did not agree?

[APPELLANT'S COUNSEL]: Definitely did not.

[THE COURT]: But they were given other territories and a 50 thousand dollar line of credit.

[APPELLANT'S COUNSEL]: That's correct.  They were trying to persuade my client to abandon the Baltimore territory and he would not do that, even though they did all those things.  He said, I have been here for 20 years.  I got customers, I got people I'm dealing with, so he would not do that.  And, consequently, for them to enter an agreement beforehand to take the territory - we don't even have to discuss the 50 thousand dollars or things of that nature - this agreement was entered into in 1998 between Advance and Defendant Gestetner and Ricoh to take the Baltimore territory.  This was before any discussion with Genesis about 50 thousand dollars, going elsewhere or anything.  That violates the letter of the agreement. *One dealer is not supposed to be removed from the territory to put another dealer in.  That's the language of the contract and that's what happened.*

[THE COURT]: Is there any limitation in the agreement on the number of dealers that can be put in[?]

20

[APPELLANT'S COUNSEL]: As a matter of fact, Your Honor, they said that if another dealer comes in, that will not operate to terminate your dealership agreement. So, they could let as many as they wanted to come in, but they could not give it exclusively to Advance, which they did, and they kicked Genensis out. This is the language in the contract that is really at the heart of this dispute.

[THE COURT]: Let me hear your response to that.

[COUNSEL FOR SAVIN and RICOH]: Sure, Your Honor. It was a non-exclusive agreement. We could bring in whoever we wanted to bring in. So, the mere fact that we were doing business with Advance at the same time we were doing business with the Plaintiff is by no means a violation of the dealer agreement. Whether or not we did business with Advance has nothing to do with the dispute that we're here about with now with regard to the Plaintiff. The contract, the written contract between my clients and the Plaintiff terminated in one instance on October 31, 2003, that is the Savin [GS] Agreement. Terminated by its very terms and was not renewed in any form.

The Ricoh agreement was terminated, expired by its terms, on March the 31st, 2004, and was not renewed under any circumstances.

What I hear the Plaintiff saying is that they are somehow entitled to greater rights in the absence of any written agreement than they were when they had a written agreement. And that makes no sense. If they say because we gratuitously continued to do business with them after the expiration of the agreement, then certainly we had the right to be able to terminate that whenever we wanted to, because there was no written provision that precluded us from doing so. And that is what we did. But even if there was some carry over from the prior agreement to whatever occurred after the expiration of the agreement, it has to be subject to the same types of terms and provisions as in the written agreement which included the for[u]m selection clause.

The simple fact of the matter is the Plaintiff don't [sic] get a better situation, a greater benefit because there is no written contract controlling the relationship of the parties than they would otherwise have under the written agreement, Your Honor.

\* \* \*

21

[APPELLANT'S COUNSEL]: We're not arguing about a greater agreement. The Court has already made it clear, if we continued without a written agreement once it came to the end, it has to be the same terms. So that we are on the same page, we are talking about this one agreement.

What I want to point out is, Your Honor, this is an admission from the Defendant, Gestetner/Savin, Ricoh. This is the admission I believe capsulizes what we're arguing. We're saying not that Advance couldn't come into the Baltimore territory and do business.. Of course they can compete. *We are saying they gave Advance an exclusive while they still had a contract with Genesis.*
. . .

The admission from Savin and Ricoh is in their response to our motion for a temporary restraining order and preliminary injunction on page 8.... They are saying that they would be harmed if the Court grants our temporary restraining order and preliminary injunction. We're saying there will be no harm. We're just going to purchase like regular consumers. Why would there be harm? This is the reason why. This is what they say on page 8: "Savin and Ricoh now have dealer agreement [sic] with Advance for the geographic terms formerly serviced by Genesis."

How is that harm? That is harm, Your Honor, because they gave Advance and [sic] exclusive.

* * *

[COUNSEL FOR SAVIN and RICOH]: Your Honor, how could we — he now said we were doing business during this period of time, but then complaining at the same time we had an exclusive with Advance. Well, were we doing business with them such as they get these oral contract [sic] or did we have this exclusive with Advance?

They don't overlap. We terminated the relationship with the Plaintiff. At that point in time we could do whatever we wanted with whoever we wanted. There is no question now that we terminated — that, number one, the contract expired by its own terms; and we provided proper notification of the discontinuation of any further relationship. That is now put aside. It is also now clear that during that period of time, we were, in fact, entitled to do business with whoever we wanted, including Advance, while we did business with the Plaintiff. But once the relationship with the Plaintiff terminated, and it ended appropriately, whether under the contract or whether under the law, we were then free to do whatever

22

we wanted.  And that's all that's happened.

[THE COURT]: Yes?

[APPELLANT'S COUNSEL]: I'm going to go earlier than the contract ending by its terms.  And part of our motion for temporary restraining order and preliminary injunction, we have a letter from Advance on . . . stationary indicating they [sic] now will be in the Baltimore territory.  This is 1998.  We're talking about almost five years before the contract ended by its terms.  In 1998, they had a secret agreement with Advance to give Advance the Baltimore territory.  This is what we're talking about.  They had a healthy relationship with Genesis in 1998.

[THE COURT]: They were dealing with both of you, that's all.

[APPELLANT'S COUNSEL]: They were dealing with both of us, Your Honor, but they decided to remove Genesis in order to give it to Advance exclusively.  This is the point I'm making, Your Honor.  How can they do that? Genesis was here doing the work and the contract says we will not be removed if you bring another dealer in.

[THE COURT]: They were allowed to cancel the contract upon appropriate notice.

[APPELLANT'S COUNSEL]: They were allowed to cancel the contract on appropriate notice, however what they were not allowed to do, according to the letter of the agreement is, cancel it, remove Genesis in order to give it to another dealer....

[THE COURT]: I don't see where – I read the agreement. It doesn't –

*  *  *

[COUNSEL FOR SAVIN and RICOH]:  By the statements of counsel, he's saying that we continued to do business with them.  *If we are continuing to do business with them, as a matter of fact, there was not an exclusive with Advance.  You can't do business with Genesis and do business with Advance and then say that you had an exclusive with Advance.*  The point in time when they became an exclusive was after we terminated the

23

relationship with Genesis, and at that point in time we were, in fact, entitled to do business with whoever we wanted on a non-exclusive basis or on an exclusive basis. But while the contract was in affect [sic], at the point in time that they would have any rights against us, there was no exclusivity, they were both doing business. And that is specifically expressly allowed under the terms of the provision. It specifically says you can do it. It is a non-exclusive relationship and that is what it was.

[THE COURT]: What about the argument that while you were under contract with Genesis, that you were working with Advance to give them exclusive jurisdiction? Any claim on that basis?

[COUNSEL FOR SAVIN and RICOH]: *While we were in a contractual relationship with Genesis, there was no exclusive relationship. Counsel has said that. He has said we continued to do business with them from the inception of the agreement up until some point in time after the expiration of the agreement. There was no exclusivity during that provision.*

*So, the mere fact that we were* talking about it, had discussions about it, what was going to occur in the future, that is not a violation of any provision in the contract. That is certainly not a breach of contract....

* * *

[APPELLANT'S COUNSEL]: Counsel keeps making reference there was not an exclusive agreement with Advance. Your Honor, this is the reason why we're in court. When you have issues in dispute and why a motion to dismiss is improper here. My client was met with in Washington D.C. telling them we'll give you this money, get out of here, Advance has this territory now. So, we have witnesses who will come in here and testify. We have dealers my client has gone to, can I purchase some equipment? No. Advance is the dealer here now. That's why we're in court so we can prove our case. *They keep saying it was not an exclusive. We're saying it is exclusive.*

[THE COURT]: You have to state a case. You just can't come into Court and complain, you have to have something to complain about.

[APPELLANT'S COUNSEL]: We have documents, Your Honor. We have sworn statements. Documents and sworn statements.

24

[THE COURT]: They don't mean anything. They don't mean anything if they don't give you any rights. They they [sic] don't give up [sic] your client any rights. And that's the problem I have with this. I don't see. You had a contract which here clearly allows them to bring as many people in as they wanted to into this territory. You have a contract that allows them to terminate your client on whatever notice that's set forth in the contract. And they did all that. Now it doesn't say they can't talk to one person, talk to A while they are talking to [B] or you talk to A.

[APPELLANT'S COUNSEL]: It doesn't say that, Your Honor. They had a right to let Advance come into the territory and do business. They had every right to do that. Advance could compete. We are not complaining about that. We're simply saying that you can't give the whole territory to Advance when Genesis has a contract to work this territory, and that's what happened. And we have given you documents. We have shown where they made secret agreements. We have a sworn statement my client couldn't get — he has been working for 20 years. How does he have the problem now doing business in Baltimore? Advance was given the territory and we have documents and sworn statements to that effect in the pleadings.

[THE COURT]: I don't see where you have a case.

[APPELLANT'S COUNSEL]: I understand, Your Honor. That is our position.

[THE COURT]: I will grant the motion to dismiss without prejudice to - you're [sic] suing them in New York if you want to sue them in New York, but I'm going to dismiss the case here.

[ADVANCE'S COUNSEL]: Your Honor, Severn Miller. I don't believe I put my name on [the] record.... I just want to be clear that the claim against my client is a tortious interference with contract claim. I just wanted to be sure that that's included in the dismissal.

[THE COURT]: The case is dismissed.

[ADVANCE'S COUNSEL]: Thank you.

[COURT]: Which includes your client and is dismissed without prejudice so if the Plaintiff wants to bring it

*in New York, where it should have been brought in the
first place, because if I decided this case on the
merits, I probably would have to, under the contract,
apply New York law.  So you have - because that's where
the case is supposed to be heard.  So I'm dismissing the
case without prejudice to your bringing it here and you
can bring suit in New York.*

(Emphasis added).

Judge Kaplan also issued a written Order, stating:

ORDER that the Motion of Defendants, Savin
Corporation and Ricoh Corporation, to Vacate Default
Judgment be and it is hereby GRANTED; and it is further
ORDERED that the Motion of Plaintiff, Genesis Office
Systems, Inc., for a Temporary Restraining Order and
Preliminary Injunction be and it is hereby DENIED; and it
is further
ORDERED that the Motions to Dismiss filed by
Defendants Savin Corporation, Ricoh Corporation and
Advance Business Systems & Supply Company be and they
hereby are GRANTED; and it is further
ORDERED that the above-captioned case be and it is
hereby DISMISSED without prejudice to Plaintiff's right
to bring suit in New York....

Additional facts will be included in our discussion.

## DISCUSSION

### A.

Genesis contends that, under Maryland law, Savin and RICOH had
only thirty days in which to respond to the suit.  Therefore,
appellant complains that the circuit court erred in vacating "the
default judgment"[6] entered against Savin and RICOH, "because their
resident agent was served in Maryland and more than 30 days passed
without a response."

---

[6] The court entered an Order of Default, not a default
judgment.  *Compare* Md. Rule 2-613(b) and 2-613(f).

26

In support of its position, appellant points to Rule 2-124(d), which states: "Service is made upon a corporation, incorporated association, or joint stock company by serving its resident agent, president, secretary, or treasurer." Accordingly, appellant insists that, although it served CT, Savin and RICOH "flatly ignored, for over 30 days, a lawsuit against them that they had actual notice of." And, notwithstanding, the content of the writs, appellant suggests that "it is not the clerk's responsibility to guide corporations doing business in Maryland regarding litigation." Genesis maintains that the sixty-day provision set forth in the summons "does not alter the law of Maryland."

Relying on Rule 2-613(d), appellees counter that the court did not err in vacating the Order of Default "because (1) the Complaint itself does not state a legally sufficient claim, and should not even have been brought in a Maryland court; (2) Savin was never properly served with the Complaint; and (3) RICOH properly responded to the Complaint in a timely manner consistent with the summons served upon it...."

Appellees suggest that "the trial court ... entered a default order as to Savin ... only because Genesis misrepresented to the Court that Savin had been served," via CT, even though CT is not Savin's Resident Agent. Indeed, appellees note that CT specifically "informed Genesis that it was not the resident agent for 'Gestetner/Savin....'" Thus, they claim that "the trial court

27

properly acted within its discretion to vacate the Order of Default once the truth was revealed."

With regard to RICOH, appellees point out that, while CT is its Resident Agent, the summonses "expressly provided" that RICOH had sixty days "to file a responsive pleading." Therefore, appellees assert: "When RICOH received the summons and Complaint, RICOH reasonably believed, based on the specific direction in the summons, that it had 60 days from the date of service to file a responsive pleading." Appellees add: "RICOH did not understand that Genesis' decision to serve the summons and Complaint in a manner different from what Genesis represented to the Court would shorten RICOH's time to respond." Further, appellees rely on Md. Rule 2-114(b), which provides that a writ of summons "shall contain ... the name and address of the person to be served as set forth in the complaint," and "the time within which the defendant must file a response to the complaint by pleading or motion."

In addition, appellees contend that, even if appellees should have responded within thirty days, the Motion to Dismiss was filed a "mere 6 days after Genesis now contends it should have pleaded." Consequently, they contend that it was equitable for the court to grant the motion to vacate the default order. Appellees assert: "The misleading summons procured by Genesis, and served on a non-Maryland resident, certainly constitutes a situation in which equity compels the excuse of a mere six-day delay.... Genesis

28

cannot be heard to state that it was prejudiced by the six-day delay."

And, as discussed in more detail, *infra*, appellees argue that "RICOH and Savin have meritorious defenses to the claims asserted." Accordingly, appellees maintain that, in the exercise of its discretion, the court below properly vacated the Order of Default.

In its reply brief, and in correspondence with this Court, appellant asserts that the records of the Maryland Department of Assessments and Taxation ("MDAT") reflect that CT is the resident agent for both Savin and RICOH. Accordingly, appellant claims that it "properly served" the resident agent, as "designated by the MDAT. If for any reason there was confusion, such was certainly removed when [appellant] enlightened the resident agent about the connection between Gestetner and Savin Corporation on July 14, 2004." Further, appellant suggests that "[m]ailing the summons and Complaint to the official resident agent for foreign corporations, pursuant to Rule 2-124, is perfect (in Maryland) to appraise them of the pendency of the action and to afford them the opportunity to present their objections."

Maryland Rule 2-613 governs the procedure for default judgments. It provides that, when the time for pleading has expired and the defendant has failed to plead, the court, on written motion of the plaintiff, shall enter an order of default, which shall be mailed to the defendant. But, the defendant may

move to vacate the default order within 30 days of its entry. Md. Rule 2-613(b), (c), and (d). "If the court finds that there is substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead, the court shall vacate the order." Md. Rule 2-613(e). *See Carter v. Harris*, 312 Md. 371 (1988); *Wells v. Wells*, ____ Md. App. ____, No. 845, September Term, 2005, slip op. at 10-11 (filed April 13, 2006); *Holly Hall Publ'ns Banking & Trust Co.*, 147 Md. App. 251, 267 (2002).

Rule 2-613, titled "Default Judgment," states, in part:

(b) **Order of default.** If the time for pleading has expired and a defendant has failed to plead as provided by these rules, the court, on written request of the plaintiff, shall enter an order of default. The request shall state the last known address of the defendant.

(c) **Notice.** -- Promptly upon entry of an order of default, the clerk shall issue a notice informing the defendant that the order of default has been entered and that the defendant may move to vacate the order within 30 days after its entry....

(d) **Motion by Defendant.** -- The defendant may move to vacate the order of default within 30 days after its entry. The motion shall state the reasons for the failure to plead and the legal and factual basis for the defense to the claim.

(e) **Disposition of Motion.** -- If the court finds that there is a substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead, the court shall vacate the order.

(f) **Entry of Judgment.** -- If a motion was not filed under section (d) of this Rule or was filed and denied, the court, upon request, may enter a judgment by default

30

that includes a determination as to liability and all relief sought, if it is satisfied (1) that it has jurisdiction to enter the judgment and (2) that the notice required by section (c) of this Rule was mailed. If, in order to enable the court to enter judgment, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any matter, the court may rely on affidavits, conduct hearings, or order references as appropriate, and, if requested, shall preserve to the plaintiff the right of trial by jury.

In *Flynn v. May*, 157 Md. App. 389 (2004), we examined subsection (e) of the rule, explaining: "Subsection (e) builds into the default judgment procedure a discretionary flexibility in those cases in which, following an order of default, the defendant, pursuant to subsection (d), moves within 30 days to vacate the order of default, stating in that motion 'the reasons for the failure to plead and the legal and factual basis for the defense to the claim.'" *Id.* at 399. Thus, a trial court is vested with broad discretion in determining whether to vacate an order of default. In *Holly Hall Publications, Inc.*, 147 Md. App. at 265, we said:

> In our view, the word "equitable" in the context of Rule 2-613 means "Just; conformable to principles of justice and right." *Black's Law Dictionary* 558 (7th ed., West 1999). Our reading of the rule and cases interpreting it is consistent with the general rule that the review of an interlocutory order is broad, and discretion should be exercised so as to ensure that justice is done. Such a determination requires consideration of all relevant circumstances in any given case.

Notably, the *Holly Hall* Court recognized that "the Maryland Rules and caselaw contain a preference for a determination of claims on their merits; they do not favor imposition of the

31

ultimate sanction absent clear support." *Id.* at 267.    Indeed, we said: "Maryland courts have repeatedly held that a trial court's discretion to vacate default judgments 'must be exercised liberally, lest technicality triumph over justice.'" *Id.* at 262 (quoting *Royal Ins. Co. of America v. Miles & Stockbridge, P.C.*, 133 F. Supp. 2d 747, 768-69 (D. Md. 2001)).

Accordingly, even assuming, *arguendo*, that RICOH and Savin responded a mere six days late to the suit, we are easily persuaded that the court below did not abuse its broad discretion in vacating the Order of Default.    We explain.

Pursuant to Rule 2-613(d), appellees filed a timely motion to vacate the Order of Default, in which they articulated their belief that they had sixty days in which to respond to the suit.    In assessing the reasonableness of appellees' belief, it is hard to overlook that the circuit court issued summonses that *expressly* advised Savin and RICOH "to file a written response by pleading or motion, *within 60 days after service* of this summons upon you, in this court, to the attached Complaint." (Emphasis added).    In our view, under Rule 2-114(b)(6), which provides, "A summons shall contain ... the time within which the defendant must file a response ...", appellees were entitled to rely on what the writs said.

Moreover, in its Complaint, Genesis identified RICOH as a New Jersey-based entity, and Savin as a Pennsylvania-based entity.    The

32

Complaint included out-of-state addresses for both companies, without suggesting that either had a Maryland-based resident agent. Rule 2-114(b)(3) states: "A summons shall contain ... the name of the person to be served as set forth in the complaint....." The Complaint did not specify that CT was to be served.

For these reasons, we discern neither error nor abuse of discretion by the circuit court in granting appellees' motion to vacate.

### B.

It is undisputed that the Savin Agreement expired by its own terms on October 31, 2003. Moreover, on March 24, 2004, Savin notified Genesis that it would no longer conduct business with Genesis. Similarly, it is uncontroverted that the RICOH Agreement was to expire on March 31, 2004. Although it continued on a month-to-month basis, RICOH was entitled to terminate, with 60 days' notice. Such notice was provided to appellant by letter of April 30, 2004. However, the court did not reach the merits of appellant's breach of contract claims as to Savin and RICOH. Instead, relying on the forum selection clause, it dismissed the suit as to RICOH and Savin, without prejudice.

Appellant argues that the trial court erred in recognizing the forum selection clause in the dealer agreements. Appellant acknowledges that "forum-selection clauses are valid and enforceable" unless enforcement is "clearly unreasonable." In

appellant's view, however, the forum selection clause here is unreasonable, because "there exist no connections to New York. Therefore, it seems very unreasonable to take a Maryland-based case to a state which has no connection with the parties or evidence." Further, Genesis asserts: "Plaintiff's entire business is threatened by the wrongs herein and enforcing the forum-selection clause magnifies the wrongs by burdening Plaintiff further financially."

Insisting that Maryland is the proper forum, appellant contends:

> Based on the Complaint, all parties are corporations in Maryland or near Maryland. It logically follows that all the evidence and witnesses are in Maryland or near Maryland. No party is located in New York. Factually, Plaintiff has never sold any of Defendants' products in New York or attended any meetings in New York. Just based on indisputable facts, there exist no connections to New York. Therefore, it seems very unreasonable to take a Maryland-based case to a state which has no connection with the parties or evidence.... [A]ll business with Genesis has been in Maryland or near Maryland, including the meeting to persuade Genesis to leave the Baltimore territory (i.e., the meeting which shows Defendants' intent as early as 1998).

Appellant also argues: "The second reason the forum-selection clause should not be enforced is found in the effects of the breaches of contract. Plaintiff is principally in the business of selling and servicing Defendant's products. The equipment, training, and inventory derive from Savin and Ricoh's products."

In Genesis's view, "[t]o enforce a forum-selection clause would force Genesis, in its limited-survival state, to bear a

34

financial burden which never should have arisen." According to Genesis, "This offends both reason and justice." In support of its contention, appellant adds:

> When the Defendants conspired to remove Genesis from Baltimore so Advance could assume all the business established there and terminated their professional relationship with Genesis because it did not agree with what they were doing, Genesis' very existence was jeopardized. The principal source of its income was abruptly 'cut off,' and a nation-wide ban was placed on Plaintiff which prevented it from acquiring Defendants' products in any manner. What the Defendants have done violates the letter of the agreements GS and Ricoh have with Genesis.

Appellees respond that the agreements between the parties "plainly and unambiguously assert" that the state and federal courts of New York "have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement." They maintain that appellant "produced no evidence and does not assert that the forum-selection clause[s] in its contracts with [appellees] were the product of fraud or overreaching, or that sending its cause of action to New York would contravene strong Maryland public policy." Moreover, they contend that appellant "cannot demonstrate that the contractually selected forum, New York City, is so unfair and inconvenient as, for all practical purposes, to deprive the plaintiff of a remedy or of its day in court." Similarly, they argue that no evidence was presented "that could support a finding that it would be a 'financial burden' to litigate in New York as compared to Maryland." Appellees compare the

35

Court's holding in *Gilman v. Wheat, First Securities, Inc.*, 345 Md. 361 (1997), with the instant matter, stating: "[T]he Court of Appeals in *Gilman* found that Virginia, 150 miles from Plaintiff's residence, was not a 'remote alien forum' that would invalidate a forum-selection clause. Similarly, in this case, litigating a matter less than 200 miles from Genesis' principal place of business cannot be considered a 'remote alien forum' that would require invalidating an agreed upon forum."

In its reply brief, appellant argues that "it is indeed contravening Maryland public policy to maintain that a Maryland Corporation which has been victimized by a foreign corporation via intentional breach of contract, ... must be forced (in its crippled state) to follow the same contract breached by the foreign corporation by going to an inconvenient forum which possesses none of the evidence or witnesses needed to prove the wrongs."

Under Maryland law, forum-section clauses are presumptively valid and enforceable. *Gilman*, 345 Md. at 378; *see also Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29-31 (1988). The party resisting such a clause "has the burden of demonstrating that it is unreasonable." *Gilman*, 345 Md. at 378. Specifically, the resisting party must make a

> clear showing that, in the particular circumstance, enforcement would be unreasonable, and the clause may be found to be unreasonable if (i) it was induced by fraud or overreaching, (ii) the contractually selected forum is so unfair and inconvenient as, for all practical purposes, to deprive the plaintiff of a remedy or of its

day in court, or (iii) enforcement would contravene a
strong public policy of the State where the action is
being filed.

*Id.*

*Gilman*, 345 Md. 361, is instructive.  There, the Court of

Appeals considered a forum-selection clause in a securities

brokerage contract that required the litigation of claims in a

jurisdiction that lacked a class action mechanism.  *Id.* at 363-64.

The Court noted that, "other than the fact that Maryland allows

class action suits and Virginia allegedly does not, Gilman has

failed to identify any strong public policy of Maryland that would

be violated by enforcing the clause."  *Id.* at 380.  The Court

observed:

> 1) a forum-selection clause is presumptively valid and
> enforceable and the party resisting it has the burden of
> demonstrating that it is unreasonable, (2) a court may
> deny enforcement of such a clause upon a clear showing
> that, in the particular circumstance, enforcement would
> be unreasonable, and (3) the clause may be found to be
> unreasonable if (i) it was induced by fraud or
> overreaching, (ii) the contractually selected forum is so
> unfair and inconvenient as, for all practical purposes,
> to deprive the plaintiff of a remedy or of its day in
> court, or (iii) enforcement would contravene a strong
> public policy of the State where the action is filed.

*Id.* at 378 (citations omitted).

But, the *Gilman* Court added that

> "it should be incumbent on the party seeking to escape
> his contract to show that trial in the contractual forum
> will be so gravely difficult and inconvenient that he
> will for all practical purposes be deprived of his day in
> court. Absent that, there is no basis for concluding that
> it would be unfair, unjust, or unreasonable to hold that
> party to his bargain."

37

*Id.* at 374 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972)).

Upholding the forum-selection clause at issue in *Gilman*, the Court reasoned, *id.* at 379:

> There is no indication that the forum-selection clause in this case was induced by fraud or overreaching. As noted, the clause was prominently displayed in the contracts, being all in capital letters, and there is no suggestion that Gilman was unaware of its existence or its meaning. He was not obliged to deal with Wheat if he objected to the clause.
>
> Nor has Gilman offered any evidence, other than the unavailability of a class action procedure, to suggest any significant inconvenience in litigating his case in a Virginia court in Richmond. Virginia is hardly a "remote alien forum," especially to a Virginia lawyer, a former instructor at a Virginia law school. Richmond is less than 150 miles from Gilman's home; most, if not all, of the relevant documents pertaining to the account and to the transactions on it are in Richmond, even if some of them may also be in Maryland; and relevant information, both documentary and testimonial, pertaining to any agreements concerning order flow payments is much more likely to be in Richmond than in Maryland.

Applying the reasoning of *Gilman* here, we are persuaded that the trial court did not err in upholding the forum selection clause in the Savin and RICOH contracts. The parties agreed upon the state or federal courts of New York as the forum to litigate any matters pertaining to the contracts. There is no suggestion that the forum-selection clause was "induced by fraud or overreaching." And, as in *Gilman*, the clauses here were prominently displayed in the contracts.

To be sure, appellant contends that litigating the matter in

38

New York will be financially burdensome. Yet, appellant did not proffer any evidence of a severe financial hardship, beyond that generally associated with litigation in a foreign jurisdiction. Nor did Genesis demonstrate that the contractually selected forum of New York is so inconvenient that, for all practical purposes, it would be deprived of its day in court. As the *Gilman* Court noted, while the particular forum at issue may be "inconvenient," where the parties to the agreement "contemplated the claimed inconvenience, 'it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable.'" 345 Md. at 374 (quoting *The Bremen*, 407 U.S. at 16).

Accordingly, we are satisfied that the trial court did not err or abuse its discretion in upholding the parties' forum selection clause.

### C.

Appellant complains that the trial court erred in its dismissal (without prejudice) of the suit against appellees. Based on our resolution of the forum selection issue, we shall focus primarily on the claims lodged against Advance.

Genesis asserts that appellees "entered a secret agreement to remove Genesis from the Baltimore territory and place Advance in it....." According to appellant, appellees contrived "an elaborate scheme" that "took years to execute," in which, eventually, the

39

dealership agreements with Genesis were terminated, "for the purpose of maintaining the improper agreement with Advance." Although appellant acknowledges that Savin and RICOH "had the right to bring other companies into the Baltimore territory," it contends that "they did not have the right to end or terminate their agreements with Genesis for the purpose of bringing Advance into the territory, according to the language of the Dealer Agreements."

According to Genesis, the "Complaint outlines [1] an agreement between [Savin] and Genesis, [2] an agreement between Ricoh and Genesis, [3] a secret agreement between Advance, [Savin], and Ricoh to remove Genesis from the Baltimore territory and place Advance in, [4] breach and anticipatory breach of the dealership agreements by [Savin] and Ricoh with Genesis, and [5] Advance successfully interfering with Genesis' business relationship with [Savin] and Ricoh in order to acquire the Baltimore territory."

In particular, appellant argues: "First, [Savin and RICOH] entered the improper agreement with Advance around 1998. Second, they had Advance to notify Genesis that [Savin] 'no longer operat[ed] through the branch/dealer system,' hoping Genesis would accept such in silence. Third, they tried to persuade Genesis to voluntarily leave the Baltimore territory after twenty years of work therein. Four[th], when Genesis would not be persuaded and its Baltimore customers continued being loyal to the company, they flatly terminated the dealership agreements despite clear language

40

therein against such conduct." As to Advance, Genesis asserts that Advance caused Savin and RICOH "to unlawfully terminate Genesis' dealership."

Appellees counter that "[t]he allegations in Genesis's Complaint are insufficient as a matter of law to sustain claims of breach of contract against Savin or Ricoh." In support of this contention, appellees observe that, "to sustain a claim for breach of contract, like those alleged against Savin and RICOH, the claimant must (1) establish that a contract existed, and (2) identify how the contract was breached." Appellees continue: "The allegations in Genesis' Complaint ... indisputably establish that neither of those [Dealer] Agreements was breached...." According to appellees, "The Complaint is devoid of any allegation that Savin breached the Agreement at any time prior to October 31, 2003," when it expired, and "[t]here is no allegation that RICOH breached that [A]greement at any time prior to March 31, 2004," when it expired. Appellees add: "Although the RICOH Agreement would have continued on a month-to-month basis, it plainly stated that RICOH could terminate the relationship if it afforded Genesis 60-days written notice. Genesis candidly concedes that RICOH did precisely that."

Appellees note that the "only provision of any contract that Genesis references with regard to an alleged breach is Section 1.1 of the Savin Agreement." In particular, Genesis asserts that the Agreement with Savin provided that Savin "could appoint other

41

retailers in Genesis' territory but such would 'not operate as a termination or cancellation of this Agreement.'" Accordingly, appellees argue that the agreements with Genesis expired on their terms and that "the appointment of Advance did not 'operate as a termination or cancellation' of the agreement with Genesis ...." Appellees add:

> Genesis does not cite what provision in the contract would prevent Savin or RICOH from deciding it no longer wished to do business with Genesis and, for whatever reason, deciding to do business with another company, Unless Savin and RICOH were not going to sell their products in the Baltimore area, any termination of its business with Genesis would necessarily result in additional business for another entity. (g.25-26)

Further, appellees argue that "the Tortious Interference Count fails to state a claim against Advance upon which the relief prayed may be granted because Genesis fails to allege the facts that would be necessary to state a legally cognizable claim."

According to appellees, Genesis did not plead facts that satisfy the elements of either type of tortious interference claim: 1) inducing the breach of an existing contract or 2) wrongfully interfering with economic relationships in the absence of a breach of contract. *See K&K Management, Inc. v. Lee*, 316 Md. 137, 154 (1989); *Natural Design, Inc. v. The Rouse Co.*, 302 Md. 47, 69-70 (1984). Appellees state:

> Genesis' Complaint establishes that there was no breach of any existing contract, nor does Genesis allege any facts that would constitute malicious or wrongful acts by Advance such as could support a claim for

42

tortious interference with a prospective contractual relationship under Maryland law. Accordingly, as a matter of law, Genesis' Complaint fails to state a claim against Advance and should be dismissed.

Moreover, appellees argue:

The facts alleged do not state a *prima facie* case that any existing contract was breached. To the contrary, the sworn factual allegations of the Complaint make it clear that the parties to the respective contracts fully performed their obligations. Genesis has therefore failed to plead the first variety [of] tortious interference. Genesis' conclusory statement that there was a breach of contract is wholly at odds with the facts it alleges. A conclusory statement is not sufficient to state a claim. Because Genesis has not pleaded *facts* that show any breach of contract, there is no actionable claim that Advance induced such a breach.

As a matter of law, terminating an at-will contract does not constitute a breach. *See Lubore v. RPM Associates, Inc.*, 109 Md. App. 312 (1996)....

In reviewing the trial court's grant of a motion to dismiss, we assume the truth of all well-pleaded facts in the Complaint. *Reichs Ford Road Joint Venture v. State Roads Commission of the State Highway Administration*, 388 Md. 500, 509 (2005); *Adamson v. Correctional Medical Services*, 359 Md. 238, 246 (2000); *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 555 (1999). Moreover, the court must consider the facts and inferences in the light most favorable to the plaintiff. *See Shoemaker v. Smith*, 353 Md. 143, 167 (1999); *Parker v. Kowalsky & Hirschhorn, P.A.*, 124 Md. App 447, 458 (1999).

If a complaint, on its face, fails to state a legally sufficient cause of action, then we must affirm the dismissal order. *See Lubore v. RPM Assocs.*, 109 Md. App. 312, 322, *cert.*

43

*denied*, 343 Md. 565 (1996); *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md. App. 772, 785 (1992), *cert. denied*, 330 Md. 319 (1993). On the other hand, when the allegations state a claim, dismissal is not proper, even if the claim may later be shown to lack merit. *See Campbell v. Cushwa*, 133 Md. App. 519, 624 (2000). This means that we may only affirm the trial court if, assuming the truth of the facts alleged, the plaintiff is not entitled to relief as a matter of law.

Appellant has not referred us to a Maryland case that recognizes a cause of action for alleged interference with a contract that has been fully performed. As appellees point out:

> Genesis does not allege that there was ever any prospective contract between it and Savin or RICOH, nor does it allege that either Savin or RICOH ever expected or intended to renew its relationship with Genesis after October 31, 2003 and March 31, 2004, respectively.... Savin and RICOH then gave appropriate written notice that the old agreements had expired and were terminated fully in accordance with their terms. There was simply no prospective contract beyond the Savin and RICOH Agreements, which were fully performed and properly terminated.

Moreover, we agree with appellees, who argue:

> The facts alleged against Advance simply do not amount to anything more than garden-variety competition. Genesis has not alleged any independently unlawful or wrongful act by Advance, either to induce the termination of an at-will contract or to induce Savin and RICOH not to enter into a prospect contract. All that is alleged is that Advance "complained" to Savin. Complaining is not an unlawful, wrongful, or tortious act.

* * *

Alleged complaining does not constitute a predatory means

44

such as threats or violence; complaining is not tortious. Trying to acquire the Baltimore territory is not independently unlawful or wrongful.

Maryland has long recognized the tort of interference with contractual or business relationships. *See, e.g.*, *Medical Mutual v. Evander*, 339 Md. 41 (1995); *Alexander v. Evander*, 336 Md. 635, 650 A.2d 260 (1994); *K & K Management v. Lee*, 316 Md. 137 (1989); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47 (1984); *Beane v. McMullen*, 265 Md. 585, 603 (1972); *McCarter v. Baltimore Chamber of Commerce*, 126 Md. 131, 136 (1915). In *K & K Management*, *supra*, 316 Md. at 154-55, the Court explained:

> Tortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D). We have said that "the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984). The elements of the form of the tort involving prospective contracts were listed in *Natural Design*.
>
> > "'"(1) [I]ntentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."'"
>
> 302 Md. at 71, 485 A.2d at 675 (quoting *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909), in turn quoting from *Walker v. Cronin*, 107 Mass. 555, 562 (1871)).

With this in mind, we are persuaded that the trial court did not err in granting appellees' motion as to Advance. We agree with appellees that "the appointment of Advance did not 'operate as a termination or cancellation' of the agreement with Genesis; the Agreements expired under their own terms." Moreover, Genesis admitted that Savin and RICOH "had the right to bring other companies into the Baltimore territory." Instead, appellant alleges that Savin and RICOH "did not have the right to end or terminate their agreements with Genesis *for the purpose of* bringing Advance into the territory, according to the language of the Dealer Agreements." (Emphasis in original). Appellant's argument is not supported by the allegations or the underlying dealer agreements, appended to the suit.

Moreover, as a matter of law, terminating an at-will contract does not constitute a breach. *Lubore v. RFM Associates, Inc.*, 109 Md. App. 312 (1996), cited by appellees, is pertinent.

Lubore filed a complaint alleging, *inter alia*, that his employers breached an at-will employment contract. *Id.* at 322. The trial court dismissed the complaint for failure to state a claim. *Id.* On appeal, we affirmed the dismissal of the breach of contract claim, concluding that the employers "were legally entitled to terminate the contract at any time (and therefore did not breach it (by firing Lubore)) because it was an at-will contract." *Id.* at 324.

46

Here, the Savin and RICOH Agreements were terminable at will after they expired. Genesis admitted that it received the requisite termination notices. Although the Complaint asserts that Advance interfered with the Savin and RICOH agreements "by causing [Savin] and RICOH to unlawfully terminate Genesis' dealerships," there are not facts alleged to establish that Advance interfered with a contract that had already been fully performed. Thus, the Complaint failed to state a claim against Advance for inducing such a breach.

D.

In its last contention, appellant argues that the trial court erred by failing to grant its request for a temporary restraining order. Appellant argues that, "[b]y prohibiting the sale of equipment to Plaintiff, Defendants have not made it impossible for Plaintiff's business to continue meaningfully pending full adjudication of their dispute." Moreover, appellant suggests that the "immediate, substantial, and irreparable injury to Plaintiff's business is found in the fact that its inventory and trained staff are products of Defendants' equipment." Appellant also argues that "[t]he documentary evidence alone warrants a restraining order. Since the merits of the case favor Genesis, minimally Savin and Ricoh should have been restrained and enjoyed from placing a nationwide ban on Genesis during litigation."

Although appellees did not address this contention in their

47

brief, they did respond in their opposition to appellant's "Motion for a Temporary Restraining Order and Preliminary Injunction." Appellees averred there that appellant "offer[ed] no support for [its] contention." Appellees also suggested that "Plaintiff is unlikely to succeed on his claim against Savin and Ricoh for the additional reason that that the litigation has been brought in an improper venue." Finally, appellees argued that appellant failed to "establish[] that it will suffer irreparable injury if the preliminary injunction is denied and that this injury outweighs the injury Defendants will bear if the injunction is granted."

Recently, in *DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc.*, 161 Md. App. 640 (2005), this Court reviewed the factors that a trial court must consider before issuing an injunction. We stated, *id.* at 647-48:

> In deciding whether to grant a request for a preliminary injunction, trial judges must consider the following four factors:
>
> 1. the likelihood that the plaintiff will succeed on the merits;
>
> 2. the "balance of conveniences," determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal;
>
> 3. whether plaintiff will suffer irreparable injury unless the injunction is granted; and
>
> 4. the public interest.
>
> *See generally Lerner v. Lerner*, 306 Md. 771, 783-85 (1986); *Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*, 117 Md. App. 290, 303-05 (1997); *Teferi v. Dupont*

48

*Plaza Assocs.*, 77 Md. App. 566, 578-79 (1989); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 596-99, 617-19 (3d ed. 2003); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 7.1 (3d ed. 2004).

Despite some suggestion to the contrary[1], these factors are not like elements of a tort. *Lerner*, 306 Md. at 776-77. The four factors are simply that, factors, designed to guide trial judges in deciding whether a preliminary injunction should be issued.  If a trial judge correctly identifies and applies these factors, we will not disturb the judge's decision absent an abuse of discretion.

Although the trial court did not specifically articulate its reasoning for denying appellant's request for a temporary restraining order and preliminary injunction, we are satisfied that the court reached the appropriate outcome: New York is the proper forum for litigating the instant matter.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.   COSTS TO BE PAID BY APPELLANT.**

49